89 Cal.Rptr.2d 706 (1999)
75 Cal.App.4th 1038
CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON, et al., Petitioners,
v.
SUPERIOR COURT of the State of California for the County of Los Angeles, Respondent.
Powerine Oil Company, Inc., et al., Real Parties in Interest.
No. B129909.
Court of Appeal, Second District, Division Three.
October 25, 1999.
As Modified October 27, 1999.
Review Granted February 16, 2000.
*708 Hancock, Rothert & Bunshoft, Patrick A. Cathcart, Robert J. Zapf and Jo-Ann Horn Maynard, Los Angeles, for Petitioners.
No appearance for Respondent.
Isola & Bowers, David R. Isola and Aaron L. Bowers, Acampo, for Real Party in Interest Powerine Oil Company.
O'Melveny & Myers, Richard B. Goetz, Los Angeles; Wiley, Rein & Fielding, Washington, DC, John Dunfee; Sinnott, Dito, Moura & Puebla, Randolph P. Sinnott, Los Angeles; Greines, Martin, Stein & Richland, Irving H. Greines, Beverly Hills, as Amici Curiae on behalf of Petitioner; and, upon the request of the Court of Appeal.
Heller, Ehrman, White & McAuliffe, Robert S. Venning, David B. Goodwin, Esta L. Brand, San Francisco; Bill Lockyer, Attorney General, Timothy R. Patterson, Deputy Attorney General; Nossaman, Guthner, Knox & Elliott, Scott P. DeVries; Heller, Ehrman, White & McAuliffe, David B. Goodwin, San Francisco; Zevnik, Horton, Guibord, McGovern, Palmer & Fognani, Michel Y. Horton, Los Angeles; Latham & Watkins, Dorn G. Bishop, William C. Tayler, San Diego, Jill N. Willis; Troop, Steuber, Pasich, Reddick & Tobey, Kirk A. Pasich, Los Angeles; City of Oakland Board of Port Commissioner, David L. Alexander, Port Attorney; Irell & Manella, Los Angeles, Thomas W. Johnson, Jr., Newport Beach, as Amici Curiae on behalf of Real Parties in Interest; and, upon the request of the Court of Appeal.
CROSKEY, J.
In this case of first impression, the petitioners, Certain Underwriters at Lloyd's of London and Certain London Market Insurance Companies ("Certain Underwriters") seek to overturn the order of the trial court which denied, in part, their motion for summary adjudication.
In Foster-Gardner, Inc. v. National Union Fire Ins. Co. (1998) 18 Cal.4th 857, mod. at 19 Cal.4th 253e, 77 Cal.Rptr.2d 107, 959 P.2d 265 ("Foster-Gardner") the Supreme Court recently held that a liability insurer's promise to defend a "suit" did not create a duty to defend administrative environmental proceedings no matter how coercive or determinative of the insured's ultimate liability for toxic cleanup and environmental remediation. Certain Underwriters relied upon that decision to support their argument to the trial court that they likewise had no duty to indemnify their insured, real party in interest herein, the Powerine Oil Company, Inc. ("Powerine"), and therefore Powerine's Second Amended Cross-Complaint seeking a judgment declaring its right to such relief from its several insurers could be summarily adjudicated in favor of Certain Underwriters. The trial court was not persuaded.
However, in reliance upon the holding and reasoning of Foster-Gardner, and settled principles of policy interpretation, we conclude otherwise. We hold that Certain Underwriters' promise, in their primary policy, to indemnify Powerine for all sums for which it becomes "legally obligated" to *709 pay "as damages" because of "property damage" resulting from covered acts, necessarily refers to an obligation established by the judgment of a court of law; an insured could not have an objectively reasonable expectation that such coverage promise extended to coercive administrative environmental orders issued against the insured which have not been reduced to a legal judgment or equitable decree. We therefore will grant the requested writ relief.

FACTUAL AND PROCEDURAL BACKGROUND[1]
Powerine was engaged in the oil refining business for approximately 60 years. Through its predecessor, Rothschild Oil, it commenced oil refining operations in Santa Fe Springs, California, in the mid-1930's. Over the years it expanded those operations and by the late 1970's Powerine's business occupied over 100 acres and employed over 500 people. In addition, Powerine also engaged in oil and petroleum-related exploration, production, terminating and transportation operations throughout the western states. However, in approximately 1985, a soft petroleum market resulted in a significant financial reversal, eventually forcing Powerine into bankruptcy. Ultimately, it divested itself of all of its operations except for its refinery in Santa Fe Springs. Even so, that refinery has only been periodically operated between 1986-1995. Since the latter date, it has not been operated at all, and only a skeleton crew of employees has remained, primarily for environmental compliance and equipment maintenance purposes.
This litigation arises from certain administrative environmental proceedings which were commenced against Powerine in 1985 by the California Regional Water Quality Control Board ("CRWQCB").[2] The record reflects, and Powerine does not dispute, that over the years of its operations substantial soil and groundwater contamination occurred as the result of the leakage of jet fuel, gasoline and other petroleum products from its pipelines, storage facilities, and refinery operations. In 1985, the CRWQCB for the Los Angeles Region issued Cleanup and Abatement Order ("CAO") No. 85-17 against Powerine which required it to conduct a sub-surface investigation of its Santa Fe Springs refinery to detect and assess conditions of soil and groundwater contamination.
Subsequently, the CRWQCB for the San Diego Region issued CAO No. 92-01 which required Powerine to investigate and abate soil and groundwater contamination at, and emanating from, its San Diego storage facility. A third CAO, No. 97-118, was issued in August of 1997 by the CRWQCB for the Los Angeles Region. This order required Powerine to investigate and clean up, or otherwise abate, the effects of soil and groundwater contamination originating from its refinery and its interconnecting network of underground pipelines.[3]
In addition to these orders issued by the CRWQCB, Powerine also has received two separate potentially responsible party *710 ("PRP") notices from the federal Environmental Protection Agency ("EPA")[4] relating to the (1) Waste Disposal, Inc. Superfund Site (a 43-acre site in Santa Fe Springs, to which Powerine had sent waste products for dumping) and (2) Operating Industries, Inc. Superfund Site (a 190-acre former landfill located in Monterey Park which had accepted solid and liquid industrial hazardous wastes and municipal trash during the period 1948 to 1984, to which Powerine sent waste products beginning in 1974).[5]
In view of the very substantial exposure which these environmental claims presented, Powerine turned to its several insurers and tendered defense of the pending administrative proceedings. It appears that each of the insurers denied coverage and (with one exception) denied a defense. One of those insurers, Highlands Insurance Company, filed this action on November 18, 1997 seeking a declaratory judgment with respect to the coverage issue. Powerine responded with a cross-complaint[6] against all of its insurers, including Certain Underwriters.[7] In that pleading, Powerine also sought a declaratory judgment resolving the coverage issue; in addition, Powerine sought a damage recovery for breach of contract, breach of the implied covenant of good faith and fair dealing and unfair competition. (Bus. & Prof. Code, § 17200 et seq.)
On December 23, 1998, Certain Underwriters responded to Powerine's cross-complaint with a motion for the summary adjudication of four separate issues (referred to henceforth as, respectively, Issues 1, 2, 3, and 4):
1. "Underwriters do not owe Cross-Complainant, Powerine Oil Company ("Cross-Complainant") a `duty to defend' or a `duty to indemnify' under `primary' policy number LAB 2579, because Cross-Complainant's Second-Amended Complaint alleges no `suit' which triggers Underwriters' duty to defend, and because no `damages' within the meaning of that policy have been ordered by a court against Cross-Complainant.
2. "Underwriters do not owe Cross-Complainant a `duty to defend' under `excess' and `umbrella' policy numbers LA 62213, 36098, ST 12754, V 21649 and 12732, because Underwriters have no duty to defend under those policies."
3. "Underwriters do not owe Cross-Complainant a `duty to indemnify' under `excess' and `umbrella' policy numbers LA *711 62213, 36098, ST 12764, V 21649 and 12732, because no `damages' within the meaning of those policies have been ordered by a court against Cross-Complainant, and there has been no adjudication that Cross-Complainant has become `legally obligated to pay as damages' any claims allegedly covered by those policies."
4. "The only claims at issue in this lawsuit are the administrative cleanup, remediation and investigation orders identified in the Second Amended Complaint as the `Environmental actions'"
The record reflects that Certain Underwriters had issued to Powerine during the relevant period one primary liability policy, four excess policies, and one umbrella policy. Because Powerine concedes that Foster-Gardner precludes any claim against Certain Underwriters under any of the policies for a defense, the only issue with which we will be concerned is whether Certain Underwriters owed Powerine a duty to indemnify it for its costs and expenses incurred in complying with the various administrative environmental cleanup and remediation orders. Therefore, the relevant portions of the insuring clauses of the six policies may be economically summarized as follows:

1. Primary Policy No. LAB 2579 (3-year policy commencing 5/1/58).

"Coverage D. Property Damage Liability-Except Automobile. To pay on behalf of the Assured all sums which the Assured shall become legally obligated to pay as damages because of injury to or destruction of property ... irrespective of whether such damages are imposed by law or assumed under contract" (Italics added.)
With respect to the coverage for such Property Damage Liability, the policy also promised that the Underwriters shall, on behalf of the insured, "Defend in his name and behalf any suit against the Assured arising out of or alleging ... such injury to or destruction of property (including the loss of use thereof following injury or destruction) and seeking damages on account thereof or seeking damages by reason of a contract under which the assured assumed or is alleged to have assumed liability of others therefor, even if such suit is groundless, false or fraudulent; but Underwriters shall have the right to make such investigation, negotiation and settlement of any such claim or suit as may be deemed expedient by Underwriters; ...." (Italics added.)
In a liability limitation section, the policy provided: "Underwriters shall not be obligated to settle any claim or suit against the Assured, but if they desire to do so they may require named Assured to first pay the cost of such settlement up to but not exceeding the deductible amount stated in the declarations. If Underwriters shall settle any claim or suit against the Assured, whether or not reduced to judgment, the named Assured shall, upon demand reimburse Underwriters therefor but not for any amount as respects each occurrence, in excess of the deductible amount stated in the declarations."
The policy contained a "no action" clause which provided, in part: "No action by any person or organization other than the Assured shall lie against the Underwriters until the Assured's obligation to pay shall finally have been determined either by judgment against the Assured after actual trial or by written agreement between the Assured, the Claimant and the Underwriters...." (Italics added.)

2. Excess Policy No. LA 62213 (3-year policy commencing 5/1/58). The relevant portion of the insuring clause of this policy, which was written and issued contemporaneously with the above-described primary policy, provides:
"... to pay on behalf of the Assured in respect of accidents occurring during the period stated herein for any and all sums which the insured shall by law become liable to pay and shall pay or by final judgment be adjudged to pay to any person or persons ... as damages ... [¶] ... (2) for damage to or destruction of property *712 of others caused by accident, hereinafter referred to as `Property Damage.'" (Italics added.)[8]

3. Excess Policies Nos. 36098 (3-year policy commencing 8/17/63); ST 12754 (3-year policy commencing 8/17/66); and V 21649 (3-year policy commencing 10/26/70). The relevant portion of the insuring clauses of these policies promised in each instance:
"... to pay on behalf of the Assured all sums which the Assured shall become legally obligated to pay, or by final judgment be adjudged to pay, to any person or persons as damages ... [¶] ... for damage to or destruction of property of others ... (hereinafter referred to as `Property Damage') caused by accident occurring during the [policy] period ... and arising out of such hazards as are set forth [in the schedule] and which are also covered by and defined in the [policies issued by the] `Primary Insurers'...." (Italics added.)[9]

4. Umbrella Policy No. 12732 (3-year policy commencing 10/8/76). The relevant portion of the insuring clause of this policy promised:
"... to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability (a) imposed upon the insured by law, or (b) assumed under contract or agreement by the Named Insured ... for damages on account of: ... (ii) Property Damage ... caused by or arising out of each occurrence happening anywhere in the world, and arising out the hazards covered by and as defined in the Underlying Umbrella Policies...." (Italics added.)[10]
Certain Underwriters' motion for summary adjudication came before the trial court on January 29, 1999 and the trial court analyzed the only real issue argued by the parties as one requiring an interpretation of the above-quoted insuring clauses. In view of the decision in Foster-Gardner, there was no argument about the existence of any duty of defense. Indeed, Powerine has conceded the point and states that it is not even seeking to enforce such a duty. Thus, the trial court had to decide if the language of the several policies precluded any duty of indemnification because no lawsuit had been filed against Powerine and all of the claims against it had been asserted in formal coercive administrative environmental proceedings.
The trial court concluded that the language of the insuring clauses did not *713 clearly and unambiguously limit the insurer's liability to indemnify to lawsuits or litigation against the insured. Indeed, as the trial court stated, "... [i]f the underwriters intended it to be so, they should have said so. The underwriters created an ambiguity." The trial court resolved that ambiguity in favor of the insured's "objectively reasonable expectations," and, on February 3, 1999, issued its minute order which denied Certain Underwriters' motion for summary adjudication as to Issue 1 (related to primary policy No. LAB 2579) and Issue 3, which dealt with excess and umbrella policies Nos. LA 62213, 36098, ST 12754, V21649, and 12732 as they related to the duty to indemnify.[11]
Certain Underwriters then filed a timely petition for a writ of mandate as to the portion of the trial court's order denying its motion to summarily adjudicate the issue of its alleged duty to indemnify. On April 19, 1999, we issued an order to show cause and set this matter for hearing. Thereafter, on June 8, 1999, we sent out a letter invitation for the submission of amicus curiae briefs[12] and set the matter upon a special calendar for extended argument.

ISSUE PRESENTED
The issue presented by this writ is simple and straightforward. In the wake of the Supreme Court's decision in Foster-Gardner, does a liability insurer who has made a commitment to indemnify, in the terms utilized in the primary policy now before this court, have a duty to indemnify an insured for the cost and expense incurred to comply with the coercive orders issued during administrative environmental proceedings?[13] Or, to put it another way, does the limitation of the defense obligation to a lawsuit filed in court against the insured, as articulated by the Foster-Gardner court, also extend to the insurer's duty to indemnify?

DISCUSSION

1. Standard of Review and Principles of Policy Construction

As did the trial court, we see the issue presented as requiring the interpretation of the language contained in the primary liability policy issued by Certain Underwriters; specifically, we must construe that portion of the policy's insuring clauses in which the promise to indemnify is set forth. This is a question of law which we resolve de novo. (Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619.) We are not bound by either the analysis or the conclusion of the trial court. To begin that task, however, it is appropriate to restate some well-settled principles of policy construction.
In AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253 ("AIU"), the Supreme Court set forth the basic rules which must guide our interpretation of any policy of insurance. Those rules are based upon statutes dealing with the interpretation of contracts generally. (Id. at pp. 821-822, 274 Cal. Rptr. 820, 799 P.2d 1253.) The mutual intention of the parties at the time the contract is formed governs interpretation. (Civ.Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (Civ.Code, § 1639.) The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" (Civ.Code, § 1644), will control judicial interpretation. *714 (Civ.Code, § 1638.) Finally, a contract is to be read as a whole, "so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ.Code, § 1641; italics added.)
The Supreme Court expounded on these principles two years later in its decision in Bank of the West v. Superior Court (1992) 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 833 P.2d 545, where it stated that "[w]hile insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. If contractual language is clear and explicit, it governs. On the other hand, `[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, `the objectively reasonable expectations of the insured.' Only if this rule does not resolve the ambiguity do we then resolve it against the insurer. [¶] In summary, a court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy. This is because 'language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.'" (Id. at pp. 1264-1265, 10 Cal.Rptr.2d 538, 833 P.2d 545; italics in original, citations omitted.)
Thus, the Bank of the West court made it clear that it was no longer enough to find an abstract ambiguity or a meaning for a disputed word or phrase which was simply "semantically permissible." In order to conclude that an ambiguity exists which will be construed against an insurer, it is necessary first to determine whether the coverage under the policy, which would result from such a construction, is consistent with the insured's objectively reasonable expectations. (Cooper Companies v. Transcontinental Ins. Co. (1995) 31 Cal. App.4th 1094, 1106, 37 Cal.Rptr.2d 508.) In order to do this, the disputed policy language must be examined in context with regard to its intended function in the policy. (Bank of the West v. Superior Court, supra, 2 Cal.4th at p. 1265, 10 Cal. Rptr.2d 538, 833 P.2d 545.) This requires a consideration of (1) the policy as a whole, (2) the circumstances of the case in which the claim arises and (3) "common sense." (Id. at p. 1276, 10 Cal.Rptr.2d 538, 833 P.2d 545.) Such an evaluation of an insured's objectively reasonable expectations under that criteria may result in a restriction of coverage rather than an expansion. (Sequoia Ins. Co. v. Royal Ins. Co. of America (9th Cir.1992) 971 F.2d 1385, 1390 (applying California law).) An insured will not be able successfully to claim coverage where a reasonable person would not expect it. (See, e.g., La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co. (1994) 9 Cal.4th 27, 41-43, 36 Cal.Rptr.2d 100, 884 P.2d 1048; Farmers Ins. Exchange v. Knopp (1996) 50 Cal.App.4th 1415, 1423, 58 Cal.Rptr.2d 331; A.C. Label Co., Inc. v. Transamerica Ins. Co. (1996) 48 Cal.App.4th 1188, 1194, 56 Cal.Rptr.2d 207; Cooper Companies v. Transcontinental Ins. Co., supra, 31 Cal.App.4th at p. 1104, 37 Cal.Rptr.2d 508.)
"A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." (Waller v. Truck Ins. Exchange, Inc., supra, 11 Cal.4th at p. 18, 44 Cal.Rptr.2d 370, 900 P.2d 619; Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co. (1993) 5 Cal.4th 854, 867, 21 Cal.Rptr.2d 691, 855 P.2d 1263.) However, the fact that a term is not defined in *715 a policy does not, by itself, make it ambiguous. (Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co., supra, 5 Cal.4th at p. 866, 21 Cal.Rptr.2d 691, 855 P.2d 1263.) Nor does "[d]isagreement concerning the meaning of a phrase," or "`the fact that a word or phrase isolated from its context is susceptible of more than one meaning.'" (Castro v. Fireman's Fund American Life Ins. Co. (1988) 206 Cal.App.3d 1114, 1120, 253 Cal.Rptr. 833; italics added.)

2. Nature and Scope of the Environmental Administrative Procedures

As a further predicate to our analysis of the relevant insuring clause contained in the primary policy issued to Powerine by Certain Underwriters, it is also appropriate to look at the statutory and administrative enforcement scheme with which an accused polluter is required to deal.
During the past thirty years, the California Legislature has expressly empowered state environmental agencies with authority to issue orders requiring cleanup and remediation of sites contaminated with toxic materials. In 1969, it overhauled the state's water quality control laws, based on a recognized need for "a statewide program for the control of the quality of all the waters of the state; that the state must be prepared to exercise its full power and jurisdiction to protect the quality of waters in the state from degradation ..., and that the statewide program for water quality control can be most effectively administered regionally, within a framework of statewide coordination and policy." (Wat.Code, § 13000.) It was the intent of the Legislature "that the state board and each regional board shall be the principal state agencies with primary responsibility for the coordination and control of water quality. The state board and regional boards in exercising any power granted in this division shall conform to and implement the policies of this chapter...." (Wat.Code, § 13001; italics added.) The new law took effect on January 1, 1970 as the Porter-Cologne Water Quality Control Act (Wat.Code, § 13000 et seq.; see fn. 2, ante.) It is this statutory scheme which is involved in this particular case.
At the enforcement center of this statutory program is the authority of the nine Regional Boards (see Wat.Code, §§ 13200, 13201) to issue Cleanup and Abatement Orders. (See Wat.Code, § 13304.) Any person who has discharged waste into state waters, including groundwater, "shall upon order of the regional board, clean up the waste or abate the effects of the waste, or, in the case of threatened pollution or nuisance, take other necessary remedial action, including, but not limited to, overseeing cleanup and abatement efforts. Upon failure of any person to comply with the cleanup or abatement order, the Attorney General, at the request of the board, shall petition the superior court for that county for the issuance of an injunction requiring the person to comply with the order." (Wat.Code, § 13304, subd. (a).) As already noted, such administrative orders were issued in this matter. Powerine, having chosen to comply, was not subjected to judicial enforcement proceedings by the Attorney General.
The accused polluter must either comply with a regional board cleanup and abatement order, or challenge it through an administrative appeal process to the state board. (Wat.Code, § 13320.) In addition, the regional boards of the CRWQCB have authority to impose penalties: up to $5000 per day for discharges in violation of an order, and up to $1,000 per day for violations that do not involve a discharge. (Wat.Code, § 13350, subds. (d)(1) and (f)(1).) Unless timely judicial review is sought with respect to such civil penalties by the aggrieved party, they can be converted into a judgment upon the application of the state board to the clerk of the appropriate court (Wat.Code, § 13328) and will not thereafter be subject to review in any court. (Wat.Code, § 13330, subd. (c).)
As noted, an aggrieved party may seek review of the order of a regional board. *716 However, such review must first be sought from the state board before seeking review in the superior court. (Wat.Code, §§ 13320 and 13330.) Court review is accomplished by a petition for a writ of administrative mandamus (Code Civ. Proc, § 1094.5) filed within 30 days from the date of service of a copy of the decision or order. (Wat.Code, § 13330, subds.(a)(b)) A failure to file a timely petition precludes any further judicial review. (Wat.Code, § 13330, subd. (c).) Such review will be based on the record developed before the state board (Wat. Code, §§ 13320, subd. (b), 13330, subd. (d)) and shall involve the court's exercise of its independent judgment on the evidence. (Wat.Code, § 13330, subd. (d).)[14]
In this case, Powerine alleged that it had also been named as a potentially responsible party by the federal EPA under CERCLA. (See fn. 4, ante.) This is the principal federal statute which also has granted great authority to an administrative agency. From the outset, an administrative proceeding under CERCLA is adversarial and coercive. It is clear that parties named in such proceedings have little, if any, choice but to comply with the agency's dictates. Once the EPA begins an administrative proceeding, the statute prohibits a party from seeking injunctive relief or other judicial review of the EPA's actions until that proceeding has run its course. A potentially responsible party, or PRP, may only seek judicial review after the EPA reaches its administrative decision, and after the EPA itself commences a cost recovery or enforcement action. (42 U.S.C., § 9613(h); see, e.g., Hanford Dounwinders Coalition v. Dowdle (9th Cir.1995) 71 F.3d 1469, 1474 ["To ensure that cleanup efforts would not be delayed by litigation ... § 9613(h) ... prevents federal courts from exercising jurisdiction over legal challenges to ongoing CERCLA `removal' or `remedial' activity"].) A party seeking to challenge in court the EPA's actions and decision finds that its ability to do so is quite limited. First, any such challenge must be based solely on the agency's administrative record  a PRP may not supplement the record before the Court. (42 U.S.C., § 9613(j)(1).) Further, a PRP must overcome an agency-friendly standard of review  to prevail the PRP must show that the agency acted "arbitrarily and capriciously." (42 U.S.C. § 9613(j)(2); see O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n (9th Cir.1996) 92 F.3d 940, 942 ("[r]eview under the arbitrary and capricious standard is narrow, and the reviewing court may not substitute its judgment for that of the agency").) Under the statute, the EPA is *717 empowered to issue administrative orders requiring the PRP to conduct or participate in the investigation and remediation of contaminated areas. (42 U.S.C. § 9604(a)(1).) Such an order is binding on the PRP, and will only be overturned if the PRP shows that the EPA acted arbitrarily and capriciously. Ignoring an EPA order can be very expensive. A PRP that fails to cooperate with EPA directives can be liable for fines of up to $25,000 per day (42 U.S.C, § 9606(b)(1)), and for punitive damages of up to three times the cleanup costs incurred by the EPA. (42 U.S.C. § 9607(c)(3).)
Thus, whether we look at state or federal law, it is clear that great power and authority has been given to administrative bodies to enable them to quickly and efficiently accomplish the cleanup and remediation of contaminated sites. Accused polluters are provided with very substantial incentives to comply (or, perhaps more accurately, disincentives to the avoidance of compliance). As a result, actual court litigation seldom occurs. For example, the Attorney General, who has appeared herein as amicus in support of Powerine's position, stated in his letter brief that, "During the five-year period of 1994 through 1998, the Regional Boards [of the CRWQCB] have issued over 500 Cleanup and Abatement Orders. Of these, less than five subsequently have been referred to the Attorney General for additional enforcement through civil litigation." (Italics added.)
The environmental cleanup orders, such as those involved in this matter, are administrative orders which are issued pursuant to explicit statutory authorization and are designed to implement the Legislature's intent to expeditiously effect a cleanup of toxic sites. They are both compulsory and coercive. They are not mere requests or generic pre-filing "demand letters" with no legal effect or consequence. They must be complied with or substantial penalties may be imposed.[15] In that regard, it is worth noting that the legislative history of CERCLA provides evidence *718 that the stiff penalties for failure to negotiate with the EPA were intended to make the primary force behind cleanup efforts voluntary settlements, rather than drawnout litigation. (See H.R.Rep. No. 253, 99th Cong., 2d Sess., pt. 1 at p. 101 (1985), 1986 U.S.Code Cong. & Admin. News, at pp. 2835, 2883.)
It is in this context Powerine argues that, given such statutory schemes mandating, at least initially, the administrative management of toxic cleanup and abatement activities, an insured could harbor an objectively reasonable expectation that an insurer's promise to indemnify all sums for which the insured becomes "legally obligated" would include the costs and expenses administratively imposed under these federal and state statutes. The validity of this argument, however, depends upon the proper interpretation to be given to the language of the policy, read in context. We now turn to that issue.

3. Certain Underwriters Do Not Have A Duty To Indemnify Powerine For The Costs And Expenses Incurred To Comply With Administrative Orders

a. The Foster-Gardner Decision

In Foster-Gardner, the court concluded that a liability insurer's promise to defend a "suit" could not be reasonably construed to mean anything other than "a civil action commenced by filing a complaint." Foster-Gardner, supra, 18 Cal.4th at pp. 878-879, 77 Cal.Rptr.2d 107, 959 P.2d 265.) Thus, an insured which, like Powerine in this matter, had been subjected to coercive administrative proceedings requiring environmental cleanup and remediation, was not entitled to a defense from its insurers because no lawsuit had been filed in a court of law. The court made it clear that such administrative proceedings, no matter how coercive, still amounted only to "claims" or "demands" which an insurer had no obligation to defend. (Id. at pp. 878-879, 881-883, 77 Cal.Rptr.2d 107, 959 P.2d 265.) "[T]he unambiguous language of the policies obligated the insurers to defend a `suit,' not ... the `substantive equivalent' of a `suit.'" (Id. at p. 879, 77 Cal.Rptr.2d 107, 959 P.2d 265.) The court provided a "bright-line" rule that, "by clearly delineating the scope of risk, reduces the need for future litigation." (Id. at p. 887, 77 Cal.Rptr.2d 107, 959 P.2d 265.) An insurer's act of limiting its defense commitment to a "suit," and not extending it to include as well a "claim," constitutes an unambiguous effort to define and limit its contractual obligation. (Id. at p. 882, 77 Cal.Rptr.2d 107, 959 P.2d 265.) "Although insureds certainly deserve no less than the benefit of their bargain, insurers should be held liable for no more. (Ray Industries, Inc. v. Liberty Mut. Ins. Co. [(6th Cir.1992)] 974 F.2d [754,] 764] [`By limiting its duty to defend to "suits," [the insurer] unambiguously demonstrated its intention to avoid responsibility for any action that fell outside the traditional and well-recognized meaning of that term. This court will not deprive [the insurer] of the benefit of its bargain by forcing it to insure against the creation of a new type of legal action, a risk for which it was not paid.'].)" (Id. at p. 882, 77 Cal. Rptr.2d 107, 959 P.2d 265.)
Thus, Foster-Gardner plainly decided to adopt a literal meaning and application of a policy term which it found, when read in the context of the entire contract, to be free of ambiguity.[16] It considered and expressly rejected the so-called functional approach followed by a substantial number of courts.[17] However, the court did not expressly rule on the separate duty to *719 indemnify; indeed, it pointedly refused to do so, even by implication.[18] Nevertheless, the rationale for its decision certainly cannot be ignored when considering the issue before us. That rationale may be easily summarized. The insurer agreed to defend only a "suit" and calculated its premium based on that precise limitation. The word "suit" has a clear and unambiguous meaning when examined in the context of the language of the entire policy (e.g., policy references to the words "claim" and "suit" made it clear that they were not interchangeable terms). In addition, case law has firmly established the principle that the "parameters of a `suit'  and therefore the limits of a defense  are defined explicitly by the complaint, the policy and any other information known to the insurer." (Foster-Gardner, supra, 18 Cal.4th at p. 880, 77 Cal.Rptr.2d 107, 959 P.2d 265; italics added.) An insurer must look to the facts alleged in the complaint (and extrinsic evidence, if available) to determine the existence of a potential for coverage and thus a duty to defend. (Waller v. Truck Ins. Exchange, Inc., supra, 11 Cal.4th at p. 26, 44 Cal.Rptr.2d 370, 900 P.2d 619; Montrose Chemical Corp. v. Superior Court (1993) 6 Cal.4th 287, 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153.) The insurer, having specifically defined *720 the proceedings for which it would provide a defense, is not required to do more. (Foster-Gardner, supra, 18 Cal.4th at pp. 882-883, 77 Cal.Rptr.2d 107, 959 P.2d 265.) Such a "bright line" rule promotes stability and efficiency in the insurance system. (Id. at pp. 882, 887, 77 Cal. Rptr.2d 107, 959 P.2d 265.)
It would therefore seem to be incumbent upon us to apply the same literal approach to our interpretation of the indemnification promise. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937.)

b. Certain Underwriters' Promise To Indemnify

As reflected in the policy language which we have quoted above, the relevant indemnity commitment made by Certain Underwriters in the primary liability policy issued to Powerine was to "pay all sums" which Powerine "shall become legally obligated to pay as damages" because of injury to or destruction of property "irrespective of whether such damages are imposed by law or assumed under contract." Essentially, as articulated by the Supreme Court in its AIU decision, an analysis of the proper legal interpretation to be given to such language requires a recognition that the duty to indemnify consists of three elements, all of which must be satisfied in order for the insurer's duty to exist. The insured must become (1) "legally obligated" to pay a sum (2) "as damages" incurred because of (3) "property damage."[19] (AIU, supra, 51 Cal.3d at pp. 818, 824, 274 Cal.Rptr. 820, 799 P.2d 1253.) At the outset we note, contrary to the defense commitment, that none of these terms is expressly confined to "judgments" or "suits."
In AIU, the court was required to interpret these three elements in the context of a suit brought in equity by an environmental administrative agency seeking both an injunction and the award of response costs which it had theretofore incurred to clean up contamination allegedly caused, at least in part, by the insured. The court held that the term "legally obligated," as a matter of plain meaning, covered equitable proceedings as well as legal ones and thus there was coverage for the injunctive relief and response costs. "Because California has generally abandoned the traditional distinction between courts of equity and courts of law [citations], even a legally sophisticated policyholder might not anticipate that the term `legally obligated' precludes coverage of equitably compelled expenses." (AIU, supra, 51 Cal.3d at p. 825, 274 Cal.Rptr. 820, 799 P.2d 1253.) In short, the court concluded that the phrase "legally obligated" meant "required of the insured," whether at law or in equity. (Id. at pp. 824-825, 274 Cal.Rptr. 820, 799 P.2d 1253; see also Aerojet-General Corp. v. Transport Indemnity Co. (1997) 17 Cal.4th 38, 62, 70 Cal.Rptr.2d 118, 948 P.2d 909.) But does that mean that an insured can only be "legally obligated" to pay a sum "as damages" by the judgment or decree of a court? As we explain, we believe the answer to that question is yes.

(1) "Legally Obligated" Has Reference To The Legal Obligation Imposed By A Court Of Law

Our Supreme Court recently had occasion to discuss the term "legally obligated to pay as damages" as that phrase is used in a commercial general liability (CGL) policy. (Vandenberg v. Superior Court (1999) 21 Cal.4th 815, 88 Cal.Rptr.2d 366, 982 P.2d 229.) It did so in the context of a liability insurer's denial of coverage for damages awarded against an insured on the ground that the damages were assessed on a contractual theory. The insurer, citing a number of Court of Appeal decisions, had argued that the phrase "legally obligated to pay as damages" referred only to a liability based upon a *721 breach of duty imposed by law, that is, based on tort not on contract. In Vandenberg, the insured was held liable for the breach of a long-term real property lease based on the contamination of soils located on the leased property and the underlying groundwater.[20] However, the court held that whether the third party's claim was based on tort or contract was not the proper question. Rather, it was the "nature of the damage and the risk involved, in light of particular policy provisions, [which would] control coverage." (Id. at p. 839, 88 Cal.Rptr.2d 366, 982 P.2d 229.) The court specifically rejected the proposition that the phrase "legally obligated to pay" necessarily excluded coverage for liability arising from a breach of contract. (Id. at p. 839, 88 Cal.Rptr.2d 366, 982 P.2d 229.) "This phrase had usually been construed to mean liability imposed in a definite sum by a final judgment against the assured. [Citation.])" (Id. at p. 839, 88 Cal.Rptr.2d 366, 982 P.2d 229; italics added.) However, to conclude that such phrase could only refer to a tort claim asserted against the insured would ignore settled principles of insurance contract interpretation. (Id. at p. 839, 88 Cal.Rptr.2d 366, 982 P.2d 229.)
Absent any indication that the parties intended some special or legalistic meaning to be given to the phrase "legally obligated to pay as damages," it is settled that we must determine its meaning by interpreting the phrase as a reasonable layperson, not an attorney or an insurance expert, would construe it. (Crane v. State Farm Fire & Cas. Co. (1971) 5 Cal.3d 112, 115, 95 Cal.Rptr. 513, 485 P.2d 1129; State Farm Mut. Auto. Ins. Co. v. Crane (1990) 217 Cal.App.3d 1127, 1133, 266 Cal.Rptr. 422.) Vandenberg applied that principle: "A reasonable layperson would certainly understand `legally obligated to pay' to refer to any obligation which is binding and enforceable under the law, whether pursuant to contract or tort liability. Further, a reasonable layperson, cognizant that he or she is purchasing a `general liability' insurance policy, would not conclude such coverage term only refers to liability pled in tort, and thus entirely excludes liability pled on a theory of breach of contract. Under general insurance principles, we must interpret the phrase `legally obligated to pay as damages' in accordance with the ordinary and popular sense, not the legalistic, and erroneously premised, interpretation of the language urged by insurers." (Vandenberg v. Superior, supra, 21 Cal.4th at p. 840, 88 Cal. Rptr.2d 366, 982 P.2d 229.)
Quoting several commentators with approval, the Vandenberg court concluded, "`[W]hether a particular claim falls within the coverage afforded by a liability policy is not affected by the form of the legal proceeding. Accordingly, the legal theory asserted by the claimant is immaterial to the determination of whether the risk is covered.' [Citation.] ... `The expression "legally obligated" connotes legal responsibility that is broad in scope. It is directed at civil liability .... [which] can arise from either unintentional (negligent) or intentional tort, under common law, statute, or contract.' [Citation.] ... `The coverage agreement [which] embraces "all sums which the insured shall become legally obligated to pay as damages...." ... is intentionally broad enough to include the insured's obligation to pay damages for breach of contract as well as for tort, within limitations imposed by other terms of the coverage agreement (e.g. bodily injury and property damage as defined, caused by an occurrence) and by the exclusions....' [Citation.]" (Id. at p. 841, 88 Cal.Rptr.2d 366, 982 P.2d 229; italics in original.)
*722 Amici supporting Powerine argue that Vandenberg's requirement that the inter-pretation of the term "legally obligated" must be made through the eyes of a reasonable layman, not an attorney or insurance expert, and that it connotes a legal responsibility that is broad in scope, compels the conclusion that the term must necessarily embrace the coercive administrative environmental orders involved in this matter. Under this argument, a "broad" construction of "legally obligated" would mean that the burdens administratively imposed on Powerine with which it chose to comply, thereby avoiding any possibility of a judicial proceeding or "suit," were "legal obligations" to be indemnified under Certain Underwriters' policy. Certainly, it is argued, a reasonable layperson would understand that those administrative burdens, imposed pursuant to a statute creating an absolute liability on an accused polluter, established an "obligation which [was] binding and enforceable under the law." Therefore, amici argue, Vandenberg compels the conclusion that the term "legally obligated to pay," properly construed, constitutes part of a promise of indemnity for the administratively imposed cleanup costs paid by Powerine even though there was no "suit" and Certain Underwriters had no duty to defend. We disagree.
We believe that such a reading of Vandenberg is totally outside the context of its facts and the issues which were before that court. The court was saying no more than whatever the interpretation to be given to the term "legally obligated" it must be broad enough to include "damages for breach of contract as well as for tort." We do not believe the court was in any way suggesting that the damages to be paid, even though based on a contract theory, need not be established by a judgment. In Vandenberg, the Supreme Court was only making the simple point that it was not the "form of the proceeding" which would control coverage, but rather that the issue would be resolved by a determination as to whether the acts of the insured had created a risk covered under the policy which resulted in either bodily injury or property damage to another. If those requirements were satisfied it would not matter that the third party claimant's theory of recovery was based on contract rather than on tort.
While Vandenberg focused on the misdirection of a coverage inquiry into the form of the remedy chosen by a third party claimant, rather than into the question of whether the insured's acts or omissions had resulted in an injury to the claimant caused by a covered risk, its discussion of the phrase "legally obligated to pay as damages" is entirely consistent with the conclusion which we reach; that is, such a description of the coverage burden necessarily refers to "damages" ordered by a court of law.
Until an insured's legal liability has been established by the judgment of a court, the insurer's duty to indemnify is not triggered. In Montrose Chemical Corp. v. Admiral Ins. Co. (1995) 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878, the court contrasted the distinction between the duty to defend and the duty to indemnify in the following language which is relevant here: "The duty to defend arises when there is a potential for indemnity. [Citations.] It may exist even when coverage is in doubt and ultimately is not established. [Citations.] The obligation to indemnify, on the other hand, arises when the insured's underlying liability is established. [Citations.] Although an insurer may have a duty to defend, it ultimately may have no obligation to indemnify, either because no damages were awarded in the underlying action against the insured or because the actual judgment was for damages not covered under the policy. [Citation.] Moreover, in a declaratory relief action held before the insured's liability to third party claimants has been established the trial court will be unable to determine the amount of the insurer's indemnity obligation. [Citation.]" (Id. at p. 659, fn. 9, 42 Cal.Rptr.2d 324, 913 P.2d 878; italics added.) This language used by the court in Montrose clearly assumes that the determination of an insured's legal liability *723 or legal obligation requires a judgment of the court.[21]
Such conclusion is also supported by the Montrose court's discussion of the operation of the "known loss" or "loss in progress" rule in third party liability cases. Under Insurance Code sections 22 and 250,[22] an event to be insured against must be "unknown" or "contingent." Even though subsequent damage or loss might be deemed "inevitable," if there is at least some contingency or risk that the event might or might not occur, then it is insurable. (Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal.4th at p. 690, 42 Cal.Rptr.2d 324, 913 P.2d 878.) In Montrose, the insured had received a PRP notice from the EPA prior to the time that a policy of liability insurance had been purchased from the insurer. (Id. at p. 690, 42 Cal.Rptr.2d 324, 913 P.2d 878.) Although this notice initiated administrative proceedings, it did not establish legal liability. (Id. at pp. 690-691, 42 Cal.Rptr.2d 324, 913 P.2d 878.) Until that legal liability was established, there would be an insurable uncertainty about its imposition and there would be no "legal obligation to pay." (Id. at p. 692, 42 Cal.Rptr.2d 324, 913 P.2d 878.) The Montrose court made it clear that the establishment of such liability would require a judgment. For example, it noted, in marking the distinction between first and third party policies that "[i]n the typical third party liability policy, the carrier assumes a contractual duty to pay judgments the insured becomes legally obligated to pay as damages because of ... property damage caused by the insured." (Id. at p. 663, 42 Cal.Rptr.2d 324, 913 P.2d 878; italics added.) In addition, it later quoted with approval another court's comment about the nature of a third party liability insurer's responsibility: "`The fundamental contractual duty of the insurer in the third party case is to pay such judgments as shall be recovered against the insured....'" (Id. at p. 692, 42 Cal.Rptr.2d 324, 913 P.2d 878; quoting Austero v. National Cos. Co. (1978) 84 Cal.App.3d 1, 27-28, 148 Cal.Rptr. 653, italics added by the Montrose court; see also Clark v. Bellefonte Ins. Co. (1980) 113 Cal.App.3d 326, 336-337, 169 Cal.Rptr. 832.)[23] As a judgment can only be obtained upon an action filed in a court of law, it must follow that the term "legally obligated," as used in the indemnification promise, requires a judicial, not an administrative, proceeding.

*724 (2) Use of The Phrase "As Damages" Confirms That The "Legal Obligation" Is One Which Must Be Judicially Imposed

Even if it could be argued that the term "legally obligated," standing alone, was ambiguous, and that an insured might have an objectively reasonable expectation that it included coercive orders issued by an administrative agency, we are required to look at that term not in isolation, but rather in the context of other policy language. It is a "legal obligation" to pay certain sums "as damages." In other words, while it may be semantically possible to conclude that an administrative order might arguably appear to be a "legal obligation" (Aerojet-General Corp. v. Transport Indemnity Co., supra, 17 Cal.4th at p. 67, fn. 15, 70 Cal.Rptr.2d 118, 948 P.2d 909),[24] such a conclusion would not have any significance to the issue before us unless that legal obligation required the payment of something which could properly be characterized "as damages" incurred because of "property damage."
This was part of the problem addressed by the AIU court. Because CGL policies do not define the term "damages" as used in the indemnification promise, the court looked first to the ordinary and popular definition. Civil Code section 3281 states: "Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages." (Italics added.) This statutory definition is intended to represent the plain and ordinary meaning of the word "damages." (AIU, supra, 51 Cal.3d at p. 825, 274 Cal.Rptr. 820, 799 P.2d 1253.) "Other lay and legal definitions are similar. One dictionary, for example, defines `damages' as `the estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right.' (Webster's New Internat. Diet. (3d ed.1981) p. 581.) Black's Law Dictionary similarly defines `damages' as `[a] pecuniary compensation or indemnity, which may be recovered in the courts by any person who has suffered loss, detriment, or injury, whether to his person, property, or rights, through the unlawful act or omission of another.' (Black's Law Diet. (4th ed.1951) p. 466, col. 2.) Whatever their semantic differences, the statutory and dictionary definitions of `damages' share several basic concepts. Each requires there to be `compensation,' in `money,' `recovered' by a party for `loss' or `detriment' it has suffered through the acts of another." (Id. at pp. 825-826, 274 Cal.Rptr. 820, 799 P.2d 1253; fns. omitted; italics added.) Each of these definitional characterizations described "damages" as compensation for the violation of a legal right which is recovered. This necessarily assumes an action or "suit" which will result in a judgment allowing or awarding such recovery.
In its effort to reach a conclusion as to the meaning of the term "damages," the AIU court emphasized that it was doing so not in the abstract but only in the context of the policy language it was construing. *725 For example, defining "damages" as a sum paid to a third person as a result of "legal claims" or as "all sums the insured becomes legally obligated to pay because of property damage" would ignore the policy language and render meaningless the phrase "legally obligated to pay" in the first example or the phrase "as damages" in the second. (Id. at pp. 827-828, 274 Cal.Rptr. 820, 799 P.2d 1253.) The meaning of "damages" cannot be divorced from the context in which it is used in the policy.
In AIU, the court addressed the question of whether a suit in equity to recover (1) cleanup response costs expended by the environmental agency and (2) the cost of complying with injunctions requiring the insured to cease hazardous waste discharges, and to clean up contamination already present, involved "damages" as that term is used in a liability policy. It concluded that an equitable decree (i.e., a judgment) awarding such relief would constitute an award of damages. Thus, AIU answered the question as to whether the costs and expenses incurred to investigate, monitor and cleanup contaminated sites could be deemed "damages" under a liability policy. But it did so, in the context of a court action in which an administrative agency sought a decree in equity requiring the payment of such costs and expenses as well as injunctive relief which would mandate the removal of existing contaminants. (AIU, supra, 51 Cal.3d at pp. 815-816, 274 Cal.Rptr. 820, 799 P.2d 1253.) AIU held that this was sufficient to trigger the insurer's duty to indemnify because the decree most certainly imposed a "legal obligation," the burdens imposed by the court orders amounted to "damages," and contamination of the environment constituted "property damage." (Id. at pp. 825, 837, 840, 842, 274 Cal.Rptr. 820, 799 P.2d 1253.) However, a determination that a judicial award in equity requiring payment of such costs and expenses amounts to a "legal obligation to pay as damages," does not establish that the same result should flow where no court action has been filed by the administrative agency.
To the contrary, the Supreme Court has consistently spoken of "damages," as that term is used in a liability policy, to refer to an award made by a judgment. For example, in Bank of The West v. Superior Court, supra, 2 Cal.4th 1254, 10 Cal. Rptr.2d 538, 833 P.2d 545, it held that the term "unfair competition" as used in the clause of a liability policy which provided advertising injury coverage could not include a statutory claim for "unfair competition." (Id. at p. 1272, 10 Cal.Rptr.2d 538, 833 P.2d 545.) In explaining that result, the court stated that the statute did not allow a recovery of "damages." (Id. at p. 1266, 10 Cal.Rptr.2d 538, 833 P.2d 545.) The insurer had promised to pay on the insured's behalf "all sums which the insured shall become legally obligated to pay as damages because of ... advertising injury ..." (Id, at p. 1262, 10 Cal.Rptr.2d 538, 833 P.2d 545; italics in original, other italics omitted.) Since statutory unfair competition permitted no recovery of damages but only disgorgement of money or property wrongfully acquired (Bus. & Prof.Code, § 17203), the policy could only be interpreted to apply to common law "unfair competition." As the court put it, in language relevant to the issue before us, "[t]he policy does not purport to cover `unfair competition' in the abstract; instead, it covers 'damages' for `advertising injury' caused by `unfair competition.' Read in this context, the term `unfair competition' can only refer to a civil wrong that can support an award of damages." (Id. at p. 1265, 10 Cal.Rptr.2d 538, 833 P.2d 545; first italics in original; second italics added.)
Thus, it seems plain that the Supreme Court clearly views the term "damages" as referring to that which is awarded by the judgment of a court of law. In Bank of the West, it noted the denial of coverage by the Washington Supreme Court in a case involving a statute which limited recovery to disgorgement for violation of that state's Consumer Protection Act. It cited with approval the Washington court's conclusion that an "insurer had no duty to defend because the action did not threaten the insured with a judgment for `damages' *726 within the meaning of the policy. [Citation.]" (Id. at p. 1268, 10 Cal.Rptr.2d 538, 833 P.2d 545.) Finally, in commenting on its own earlier decision in AIU, the Bank of the West court said, "We held that the suit did seek `damages' because the judgment awarding reimbursement [of cleanup costs incurred by the government] was analogous to a judgment awarding damages for injury to property, ..." (Id. at p. 1270, 10 Cal.Rptr.2d 538, 833 P.2d 545.)
In spite of all of this, Powerine argues that the phrase "as damages" can reasonably also refer to the costs and expenses paid in response to administrative orders and should not be restricted solely to damages awarded by a court of law. For all of the reasons which we have discussed, we disagree. In addition, an objectively reasonable reading of the entire insuring clause simply does not support Powerine's argument.
When the word "damages" is used elsewhere in the insuring clause it necessarily must have the same meaning as it does in the phrase "legally obligated to pay as damages." In the portion of the clause which refers to Certain Underwriters' defense obligation, there is a promise to defend any suit arising out of the "injury to or destruction of property and seeking damages on account thereof. ..." As used in the defense clause, the word "damages" clearly and only refers to damages recoverable in a "suit." Foster-Gardner tells us that a "suit" means a lawsuit based on a complaint filed in court. Thus, the phrase "and seeking damages" can only refer to "damages" to be awarded by a court of law. The word "damages" used in the phrase "legally obligated to pay as damages" must refer to the same thing. (Levi Strauss & Co. v. Aetna Casualty & Surety Co. (1986) 184 Cal.App.3d 1479, 1486, 237 Cal.Rptr. 473.)
This conclusion is also supported by another provision in the policy. The "no action" clause specifically conditions Certain Underwriters' liability to third parties under the policy to those circumstances where Powerine's obligation to pay "shall finally have been determined either by judgment ... after actual trial or by written agreement between [Powerine], the Claimant and [Certain] Underwriters...." This clause confirms that the indemnification promise is limited to "legal obligations" established by a judgment (or a written agreement to which Certain Underwriters must be a party). Thus, when the policy is read in context, and all relevant clauses are considered, a policyholder could not have an objectively reasonable expectation that the phrase "legally obligated to pay as damages" meant anything other than those damages established by the judgment (or decree) of a court of law.[25]
*727 This is clearly a question of first impression in this state. We have found no case in California recognizing that expenses which have only been the subject of an administrative order could properly be characterized "as damages" which an insured was "legally obligated to pay." However, one federal case has touched on the issue. One of the cases cited by Powerine, and amici supporting its position, is Intel Corp. v. Hartford Acc. & Indem. (9th Cir.1991) 952 F.2d 1551. In that case, the court, applying California law, followed AIU and held that the costs incurred in cleaning up toxic waste at the contaminated site of its former manufacturing facility were "damages" within the meaning of Hartford's CGL policy. The Intel court applied AIU, but extended its holding to consent decrees. Intel, after receiving a PRP notice, entered into negotiations and reached an agreement as to remediation with the EPA, which was then embodied into a consent decree. Intel held that although AIU had involved injunctive and reimbursement relief in a contested action in equity, the same reasoning, in its view, would be applied by the California Supreme Court to consent decrees. (Id. at pp. 1563-1564.) That may well be correct as the entry of a consent decree at least arguably results in a judicial order which might qualify the procedure as a "suit" resulting in a "legal obligation to pay as damages," even though arrived at by a settlement.[26] However, that process was not utilized here and thus Intel, decided before Foster-Gardner, is of little help to Powerine.

(3) Authorities From Other Jurisdictions Cited by Powerine Rely Upon The "Functional" Rationale Rejected by Foster-Gardner

Powerine and amici supporting its position place their main reliance on a number of cases from other jurisdictions which conclude that an insuring clause like the one we have before us does provide coverage even where the insured, without any suit having been filed by the governmental agency, agrees to and does incur cleanup and remediation expense.[27] However, *728 each of these cases also recognizes the existence of a duty to defend, either expressly *729 or implicitly, and reaches that conclusion substantially on the very same public policy grounds which were rejected by Foster-Gardner when it declined to follow those courts which had adopted the socalled "functional" standard. (Foster-Gardner, supra, 18 Cal.4th at pp. 878-883, 77 Cal.Rptr.2d 107, 959 P.2d 265.)[28]
As we have noted, the Foster-Gardner court firmly rejected the functional analysis on the ground that it conflicted with clear policy terms. It quoted with approval a comment from an earlier appellate decision, "`While we agree that it is in everyone's best interests to have hazardous wastes cleaned up, we do not agree that a California court may rewrite an insurance policy for that purpose or for any purpose. This is a contract issue, and imposition of a duty to defend CERCLA proceedings that have not ripened into suits would impose on the insurer an obligation for which it may not be prepared.... Whatever merit there may be to these conflicting social and economic considerations, they have nothing whatsoever to do with our determination whether the policy's disjunctive use of "suit" and "claim" creates an ambiguity.' [Citation.]" (Foster-Gardner, supra, 18 Cal.4th at p. 888, 77 Cal.Rptr.2d 107, 959 P.2d 265, quoting Fireman's Fund Ins. Co. v. Superior Court (1997) 65 Cal.App.4th 1205, 1214, 78 Cal.Rptr.2d 418.) As the Supreme Court has made clear, the question in cases such as this is not whether a CGL policy should or may provide coverage, but whether it does so according to its terms. "The answer is to be found solely in the language of the [policy], not in public policy considerations." (AIU, supra, 51 Cal.3d at p. 818, 274 Cal.Rptr. 820, 799 P.2d 1253.)

CONCLUSION
We believe that, in the last analysis, the outcome of this case is effectively compelled by Foster-Gardner. The Supreme Court, having concluded that California will adhere to the literal approach, *730 as opposed to the functional, with respect to an insurer's duty to defend an insured in coercive administrative proceedings to effect a cleanup of contaminated toxic waste sites, we see no way to nonetheless find a duty to indemnify an insured for the cleanup and remediation costs ordered in those same proceedings. A duty to defend exists whenever there is a potential for coverage; that is, there is a potential to indemnify the insured. (Gray v. Zurich Insurance Co. (1966) 65 Cal.2d 263, 268, 54 Cal.Rptr. 104, 419 P.2d 168 ["the duty to defend arises only if the third party suit involves a liability for which the insurer would be required to indemnify the insured"]; Montrose Chemical Corp. v. Superior Court, supra, 6 Cal.4th at p. 299, 24 Cal.Rptr.2d 467, 861 P.2d 1153.) However, if no duty to defend exists then the recognition of a duty to indemnify would turn that rule, and its rationale, on its head.[29] Would this be some kind of exception to the well-settled rule that a potential for coverage defines the duty to defend? If so, why? What is its rationale if not the same public policy arguments which support the "functional" approach specifically rejected by Foster-Gardner?
Moreover, if an insurer has a duty to indemnify but no duty to defend, then how is the insurer able to protect itself with respect to those proceedings which will determine its ultimate liability? Will the insurer have to exercise its policy "right" to provide a defense at the peril of losing control of a process which it will ultimately have to underwrite? If so, then the conclusion reached in Foster-Gardner would become meaningless. The insurer, in spite of that decision, would necessarily be compelled to provide a defense.
Perhaps that is why in other states which have considered this issue, the courts which have found a duty to indemnify have also recognized that there is a duty to defend the insured in the administrative proceedings initiated to effect cleanup and remediation of contaminated toxic waste sites. (See, fn. 27, ante and cases cited thereat; see particularly CD. Spongier Const. Co. v. Indus. Crankshaft & Eng. Co., Inc., supra, 326 N.C. at p. 155, 388 S.E.2d 557 [where the North Carolina Supreme Court, in finding that a duty to indemnify and defend both existed under the insured's CGL policy, noted that, "Our research has uncovered no decisions where environmental cleanup expenses were deemed `damages because of property damage,' but where the administrative orders requiring cleanup were not deemed `suits.' In this context, invocation of the narrower duty to indemnify a fortiori invokes the broader duty to defend."]; Ryan v. Royal Ins. Co. of America (1st Cir.1990) 916 F.2d 731, 743 ["We have found on the facts of this case that [the insurance carrier] had no duty to defend under the terms of the policy and New York Insurance law. It follows a fortiori that [the insurance carrier] had no obligation to indemnify. After all, there was no `suit' against the insureds. They never became `legally obligated to pay as damages'...."], italics added.)
The courts which have reached the same conclusion as did the Foster-Gardner court have held that if there is no duty to defend, then there can be no duty to indemnify. (See, e.g., Zurich Ins. Co. v. Cams Corp., supra, 293 Ill.App.3d at pp. 909-910, 228 Ill.Dec. 258, 689 N.E.2d at p. 134; Fruit of the Loom, Inc. v. Travelers Indem. Co., supra, 284 IU.App.3d at pp. 494-95, 219 Ill.Dec. 770, 672 N.E.2d at pp. 285-286.) In Zurich, the insured argued, as does Powerine here, "that even if there is no duty to defend [because no `suit' had been brought against the insured], the carriers are under a duty to *731 indemnify that requires them to reimburse [the insured for expenses incurred while voluntarily participating in the site remediation program of the state environmental agency]. The purported source of this duty to indemnify is the policy language that provides that `the Company will pay all 
sums which the insured shall become legally obligated to pay as damages because of ... property damage.' However, "where there is no duty to defend, there will be no duty to indemnify.' [Citation.] [We have already held that] the insurers in this case had no duty to defend because no suit was brought against [the insured]. Therefore, the insurers also had no duty to indemnify. [Citation.] ... [¶] ... The rule ... is clear: an insurer's duty to defend and indemnify is triggered by a suit against the insured, and in the absence of a lawsuit, no such duty exists. Since no suit was brought against [the insured], the insurers had no duty to defend or indemnify." (Zurich Ins. Co. v. Cams Corp., supra, 293 Ill.App.3d at pp. 909-910, 228 Ill.Dec. 258, 689 N.E.2d at pp. 133-134.)
We agree with this conclusion and believe it is necessarily compelled by the holding and rationale of Foster-Gardner.[30] Thus, when the Supreme Court decided Foster-Gardner it, in reality, also decided this case.
In view of this result, we have no reason to reach or consider the several excess policies which Certain Underwriters also issued over a 20-year period. Whatever arguments might be made with respect to the particular phrasing of their indemnity commitments, they all clearly provide that liability does not attach under those policies unless the primary or other underlying insurers have either "paid or have been held liable to pay" the amounts due under the policies issued by such underlying insurers.[31] As we assume that all such underlying insurance utilizes the same policy language as the Certain Underwriters' primary policy,[32] it is clear, in view of the conclusion which we have reached, that there exists no indemnification duty on the part of those primary insurers and thus the liability of the several excess insurers herein could never attach.
Therefore, Certain Underwriters are entitled to have their summary adjudication motion granted in its entirety as to all six policies.

DISPOSITION
The order to show cause is discharged. A peremptory writ of mandate shall issue directing the trial court to vacate its order of February 3, 1999 to the extent that it denied petitioners' motion for summary adjudication of their duty to indemnify Powerine (Issues 1 and 3) and to issue a new order granting said motion. Certain Underwriters shall recover their costs in this writ proceeding.
KLEIN, P.J., concurs.
ALDRICH, J.
I dissent.
I believe that the majority's conclusion that it is inescapably bound to follow the literal-meaning approach of policy interpretation as enunciated in Foster-Gardner, Inc. v. National Union Fire Ins. Co. (1998) 18 Cal.4th 857, 77 Cal.Rptr.2d 107, 959 P.2d 265 (Foster-Gardner), is misguided. While I agree with the general policy interpretation principles delineated in the majority opinion, my view of this case diverges from that of the majority because I believe the phrase "legally obligated to pay as damages" is ambiguous, as it is susceptible of applying to court-ordered judgments as well as to environmental agency remediation notices.
*732 The implications of following Foster-Gardner in this case raise two concerns which compel me to dissent. First, I do not believe that the established principles of policy interpretation compel the result that Foster-Gardner's literal meaning approach has rendered.[1] Second, I must voice my concern about the effect of the majority's holding, which is shortsighted.

1. Policy interpretation.

At its core, this case is about the interpretation of the phrase "legally obligated to pay as damages" in the primary commercial general liability (CGL) policy. As the majority observes, "[a] policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. [Citation.]" (Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619.) "[A] court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations ...." in context, in light of its intended function in the entire policy. (Bank of the West v. Superior Court (1992) 2 Cal.4th 1254, 1265, 10 Cal.Rptr.2d 538, 833 P.2d 545.) In my view, the phrase "legally obligated to pay as damages" is ambiguous.
Much has already been said by the Supreme Court and the majority about the extremely coercive and compulsive nature of state and federal environmental statutes. The effect of such legislation is to grant broad and far reaching administrative powers to compel compliance. (Cf. Foster-Gardner, supra, 18 Cal.4th at pp. 881, 866-868, 77 Cal.Rptr.2d 107, 959 P.2d 265 [describing environmental statutory schemes]; maj. opn. at pp. 715-718 [describing environmental statutory schemes].) "From the outset, an administrative proceeding under CERCLA is adversarial and coercive. It is clear that parties named in such proceedings have little, if any, choice but to comply with the agency's dictates." (Maj. opn. at p. 716; see generally 42 U.S.C. §§ 9606(a), 9606(b)(1), 9607(c)(3), 9613(h), 9613(j)(1) and (2); Wat.Code, §§ 13304, 13350, subds. (b), (d)(1) and (f)(1); cf. Health & Saf.Code, § 25187.) In this context, there is more than one way for the potentially responsible party (PRP) to be "legally obligated." The phrase "legally obligated to pay as damages" is susceptible of applying both to EPA-ordered sums of money and to court-ordered judgments for money or injunction. Stated otherwise, given the extremely coercive nature of state and federal environmental directives, it makes little difference to the insured, who is mandated to mitigate and remediate the pollution, that the cleanup order was issued by a court or by an administrative agency. Thus, it is entirely consistent with the objectively reasonable expectations of the insured in reading this policy to conclude that the word "damages" in the phrase "legally obligated to pay as damages" necessarily encompasses amounts the insured expends to comply with federal and state administrative agency orders.
Foster-Gardner does not drive the result here. There, the Supreme Court was called upon to interpret the meaning of "suit" in the portion of the insurance policy involving the insurer's duty to defend. The Foster-Gardner Court determined that the word "suit" was not ambiguous (Foster-Gardner, supra, 18 Cal.4th at pp. 878-880, 77 Cal.Rptr.2d 107, 959 P.2d 265), and based on its literal meaning, concluded that a "suit" is an actual court proceeding, initiated by the filing of a complaint, not its "`substantive equivalent.'" (Id., at pp. 879, 882, 887, 77 Cal.Rptr.2d 107, 959 P.2d 265.) Accordingly, Foster-Gardner held that an administrative order mandating environmental assessment, monitoring, *733 or remediation, is a "claim," and not a "suit," such as would trigger the insurers' duty to defend. (Id., at pp. 879, 888, 77 Cal.Rptr.2d 107, 959 P.2d 265.) In so holding, the Court was allowed to establish a bright line with respect to the duty to defend. (Id., at pp. 882, 887, 77 Cal. Rptr.2d 107, 959 P.2d 265.) Hence, Foster-Gardner does not entail interpretation of the term "legally obligated to pay as damages" in the policy provision embracing the insurer's duty to indemnify.[2] Instead, Foster-Gardner interpreted a completely different phrase from an entirely different portion of the CGL policy than the one at issue here.
Application of the literal-meaning approach of Foster-Gardner is inapt here and, if applied, its rationale would produce the opposite result than that reached by the majority. By applying Foster-Gardner's literal-meaning approach, the majority concludes that the phrase "as damages" is unambiguous and can only be understood to be those sums which have been established by a court of law. (Maj. opn. at p. 726.) This conclusion is inapt because nowhere in the phrase "legally obligated to pay as damages" do either of the words "suit" or "judgment" appear. This absence suggests that the insurers, as policy drafters, did not intend to indemnify solely those damages set by a lawsuit or a final judgment. The insurers could easily have agreed to indemnify, for example, for "all sums for which the insured by final judgment becomes legally obligated to pay as damages...." They did not do so in the primary policy.
The language omitted from the primary policy, however, was included in Excess Policy No. LA 62213, written and issued on the same day as Primary Policy No. LAB 2579 under scrutiny here. (Maj. opn. at p. 711.) As noted by the majority, both policies are CGL policies, issued to Powerine, by the same carrier, i.e., Certain Underwriters. As above explained, in the primary policy the insurer promised to pay "... all sums which the Assured shall become legally obligated to pay as damages...." But the excess policy promised to pay "... all sums which the insured shall by law become liable to pay and shall pay or by final judgment be adjudged to pay ... as damages. ..." (Italics added.) (Maj. opn. at p. 711.) The quoted language from these two contemporaneously written policies starkly demonstrates that the insurer was well aware of the distinction between sums the insured is by law liable to pay, and sums which the insured pays as the result of a final judgment. The policies themselves show that Certain Underwriters included the language "by final judgment" when such language was deemed necessary. There is no need to read into the policies language which appears to have been knowingly omitted.[3]
Furthermore, the inclusion of the words "suit" and "claim" in the policy language influenced, in part, Foster-Gardner's analysis. There, the policy language required the insurers to defend a "suit," but gave them discretion to investigate and settle a "claim." (Foster-Gardner, supra, 18 Cal.4th at p. 878, 77 Cal.Rptr.2d 107, 959 P.2d 265.) The juxtaposition in the policy language of both words, the Supreme Court noted, "indicates that the insurers' differing rights and obligations with respect to `suits' and `claims' were deliberately and intentionally articulated...." (Id., at p. 880, 77 Cal.Rptr.2d 107, 959 P.2d 265.) Thus, the "careful separation" (ibid.) in the policy of the obligations respecting *734 "suits" from those concerning "claims" reveals the drafters' intention to ascribe differing meanings to the two obligations. This observation enabled the Supreme Court to conclude that a "suit" is a court proceeding initiated by a complaint, whereas a "claim" does not "`rise to the formal level of a suit...."' (Id., at pp. 878-879, 77 Cal.Rptr.2d 107, 959 P.2d 265.) If we were to apply this same reasoning from Foster-Gardner, then the omission from the primary policy, but inclusion in the concurrently written excess policy, of the words "by final judgment be adjudged to pay ... as damages," reflects the intention that the obligation to indemnify in the primary policy for sums which the insured is "legally obligated to pay as damages" would be triggered by both a lawsuit and a coercive administrative order. In other words, by applying the Foster-Gardner rationale, I reach a conclusion contrary to that reached by the majority.
Foster-Gardner's literal meaning approach simply does not apply to the ambiguous language at issue here. Rather than being controlled by Foster-Gardner, resolution of this case is guided by the wellsettled principles of policy interpretation enunciated in AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253 (AIU), and more recently in Vandenberg v. Superior Court (1999) 21 Cal.4th 815, 88 Cal.Rptr.2d 366, 982 P.2d 229 (Vandenberg), both of which cases addressed the meaning of the term "legally obligated to pay as damages," albeit in different circumstances than those presented here.[4]
Turning then to the well-settled rules for policy interpretation, "[t]he `clear and explicit' meaning of the [policy] provisions, interpreted in their `ordinary and popular sense,' controls judicial interpretation unless `used by the parties in a technical sense or a special meaning is given to them by usage.' [Citation.]" (Vandenberg, supra, 21 Cal.4th at pp. 839-840, 88 Cal.Rptr.2d 366, 982 P.2d 229; AIU, supra, 51 Cal.3d at p. 822, 274 Cal.Rptr. 820, 799 P.2d 1253, citing Civ.Code, § 1644.) Other than by employing a technical, literal meaning reading from Foster-Gardner, nothing in this policy suggests the parties attributed a special meaning to the phrase "legally obligated to pay as damages." In any event, the technical definition refers to a court in a permissive sense only.[5] (Black's Law Dictionary (6th ed.1990) p. 389, italics added.)
Nor does the ordinary and popular understanding of "damages" require that they be court ordered. Civil Code section 3281, which declares the ordinary and popular meaning of the word "damages" (see AIU, supra, 51 Cal.3d at p. 825, 274 Cal. Rptr. 820, 799 P.2d 1253), and lay dictionary *735 definitions contain no reference to a court-ordered sum.[6] Therefore, the reasonable layperson would not readily understand the term "as damages" to mean only those legal obligations which are fixed by a court of law.
Finally, application of Foster-Gardner's literal-meaning approach ignores the Supreme Court's most recent pronouncement in Vandenberg about the manner in which policies should be analyzed. Vandenberg stated, "[t]he nature of the damage and the risk involved, in light of particular policy provisions, control coverage." (Vandenberg v. Superior Court, supra, 21 Cal.4th at p. 839, 88 Cal.Rptr.2d 366, 982 P.2d 229.) The Vandenberg Court corrected a long line of cases which had misinterpreted the thrust of Ritchie v. Anchor Casualty Co. (1955) 135 Cal.App.2d 245, 286 P.2d 1000 (Ritchie).[7]Vandenberg explained the precursor to the phrase "legally obligated to pay," "... had usually been construed to mean liability imposed in a definite sum by a final judgment against the assured. [Citation.]" (Vandenberg, supra, at p. 839, 88 Cal.Rptr.2d 366, 982 P.2d 229.) However, the policy before Ritchie Court had two provisions, one that included "`"liability imposed ... by law or by written contract"'" and the other that applied only to "`"liability imposed ... by law."'" [Citation.] (Ibid.) Vandenberg explained that the Ritchie Court was persuaded that "the phrase `imposed upon him by law'... relates to the nature of the liability to be defended rather than the result of the lawsuit.... [Citation.]" (Ibid., italics deleted, italics added.) Thus, Vandenberg instructs us to look at the substantive nature of the liability to be defended, not at the outcome of the lawsuit. (Ibid.)
As explained in Vandenberg, "[t]he nature of the damage and the risk involved, in light of particular policy provisions, control coverage." (Vandenberg, supra, 21 Cal.4th at pp. 839, 840-841, 88 Cal.Rptr.2d 366, 982 P.2d 229.) Here, the nature of the damage is the environmental contamination; the risk involved is the work which caused fuel, gasoline and other petroleum products to leak into the soil and groundwater. A conclusion that the policy language "... `all sums which the insured [is] legally obligated to pay as damages ....' ..." encompasses only those amounts that are fixed by a court of law unnecessarily elevates the form of the proceeding over the substance of the risk and injury involved and "ignores otherwise settled principles of insurance contract interpretation." (Id., at p. 839, 88 Cal.Rptr.2d 366, 982 P.2d 229.)
Therefore, I believe in the context of the coercive nature and effect of these environmental statutes, that the phrase "legally obligated to pay as damages" is ambiguous and reasonably susceptible of including money spent in response to agency cleanup directives. To protect the objectively reasonable expectations of the insured (Bank of the West v. Superior Court, supra, 2 Cal.4th at p. 1265, 10 Cal.Rptr.2d 538, 833 P.2d 545; AIU, supra, 51 Cal.3d at pp. 822, 828, 274 Cal.Rptr. 820, 799 P.2d 1253), I would apply principles of policy interpretation which favor coverage. *736 (Vandenberg, supra, 21 Cal.4th at p. 840, 88 Cal.Rptr.2d 366, 982 P.2d 229.)

2. The effect of the majority holding.

If we are bound by Foster-Gardner, two regrettable results may follow. First, an interpretation which requires a final judgment by a court of law to trigger indemnification places the PRP in an impossible position under state and federal environmental law. On the one hand, the PRP can voluntarily respond to the agency mitigation and cleanup directive, and pay the enormous costs of remediation out of pocket. By following the dictates of Foster-Gardner and applying the literal-meaning approach to standard-form CGL policies, the PRP will have no hope of indemnification from its insurer because these costs are not "damages" the PRP was "legally obligated to pay." On the other hand, the PRP could refuse to take action in response to the agency's orders and wait for an adverse final judgment from an agency-initiated lawsuit. In doing so, the PRP would flout its legal obligations and incur potentially ruinous liability. In turn, the governmental agency will be forced to perform the remediation and sue the PRP for the remediation costs and penalties. Meanwhile, the PRP has relinquished control over expenditures and will be unable contain them. Government cleanup efforts are generally recognized as being "considerably more expensive than cleanups performed by the responsible party. [Citations.]" (AIU, supra, 51 Cal.3d at pp. 837-838, 274 Cal.Rptr. 820, 799 P.2d 1253.) Later, the PRP will find severely limited recourse in the courts. In short, the polluter is placed in a "Catch-22" position because under either option the polluter pays. The result of the majority's holding encourages circumvention of the administrative enforcement procedure at the expense of the insured and the environment, raises the specter of collusion, increases the prospect of litigation, and ignores the reasonable expectations of the insured. Also, this result frustrates the legislative purpose behind the administrative procedure to effect speedy, efficient response and remediation of our environment. (See AIU, supra, 51 Cal.3d at pp. 840-841, 274 Cal.Rptr. 820, 799 P.2d 1253; Foster-Gardner, supra, 18 Cal.4th at p. 892, 77 Cal.Rptr.2d 107, 959 P.2d 265, dis. opn. of Kennard, J.)
Turning to the second mischief, the inescapable conclusion reached as the result of the majority's extension of Foster-Gardner's literal-meaning approach to this policy provision (maj. opn. at p. 720), is that under the CGL policy language, the insurer's duty to indemnify for environmental contamination arises only when the administrative agency seeks enforcement by instigating a lawsuit, but not when that same agency issues a coercive response order. However, our Supreme Court has repeatedly rejected a construction in which coverage turns on the form of action taken against the insured. (Vandenberg, supra, 21 Cal.4th at p. 838, 88 Cal.Rptr.2d 366, 982 P.2d 229; AIU, supra, 51 Cal.3d at pp. 840-841, 274 Cal.Rptr. 820, 799 P.2d 1253.) Therefore, I echo Justice Kennard's extremely apt and prescient dissent in Foster-Gardner: "It is illogical to hold that an insurer need not pay [response and remedial] costs when they result from compliance with an administrative order rather than from compliance with an injunction. As [the AIU ] court stated, `costs of compliance must be interpreted as "damages" in the environmental context, because to hold otherwise would make insurance coverage hinge on the "mere fortuity" of the way in which government agencies seek to enforce cleanup requirements, would unreasonably constrain the agencies' choice of cleanup mechanisms, and would introduce substantial inefficiency into the cleanup process.' [Citation.]" (Foster-Gardner, supra, 18 Cal.4th at p. 892, 77 Cal. Rptr.2d 107, 959 P.2d 265, dis. opn. of Kennard, J., quoting from AIU, supra, 51 Cal.3d at pp. 840-841, 274 Cal.Rptr. 820, 799 P.2d 1253.)
For these reasons, I would hold that the costs incurred to comply with governmental remediation orders under these environmental schemes are "damages" within the meaning of the CGL policy language here, for which the insurer has a duty to indemnify.
NOTES
[1] The facts which we recite are not in dispute and are taken from the papers filed in support of and in opposition to Certain Underwriters' summary adjudication motion. The principal issue before us involves a matter of policy interpretation and that is purely an issue of law.
[2] The CRWQCB acted under the authority granted by the Porter-Cologne Water Quality Control Act. (Wat.Code, § 13000 et seq.). However, there are two other important California statutory schemes to control toxic pollution and compel cleanup and remediation of contaminated sites. They are the Carpenter-Presley-Tanner Hazardous Substances Account Act (Health & Saf.Code, § 25300 et seq.) and the Hazardous Waste Control Law. (Health & Saf.Code, § 25000 et seq.). Both of these statutes are administered by the Department of Toxic Substances Control. (See fn. 14, post.)
[3] These three CAO's have given rise to ten (10) separate, geographically-based cleanup and abatement areas for which Powerine apparently does not dispute it has some responsibility under state law.
[4] The EPA enforces, and is authorized to act, under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). (42 U.S.C. § 9601 et seq.)
[5] Powerine claims it is only one of more than 100 parties who have been identified as being "potentially" responsible for soil and groundwater contamination in the Santa Fe Springs area.
[6] The record is not clear as to when this cross-complaint was filed (a copy is not included in the record before us), but the operative pleading, a second amended cross-complaint, was filed on October 9, 1998. For convenience we will simply refer to Powerine's current pleading as the cross-complaint.
[7] Those insurers named in Powerine's cross-complaint, other than Highlands Insurance Company and Certain Underwriters, are: Aetna Insurance Company; Aetna Casualty And Surety Company; American Centennial Insurance Company; Central National Insurance Company of Omaha; Century Indemnity Company; Federal Insurance Company; Fireman's Fund Insurance Company; First State Insurance Company; Harbor Insurance Company; Industrial Insurance Company of Hawaii, Ltd.; Industrial Underwriters, Inc.; Insurance Company of North America; Integrity Insurance Company; International Surplus Lines Insurance Company; Interstate Fire & Casualty Company; New England Reinsurance Corporation; Northbrook Excess And Surplus Lines Insurance Company; Pacific Employers Insurance Company; Protective National Insurance Company of Omaha; Republic Indemnity Company of America; Reserve Insurance Company; Seven Provinces Insurance Company, Ltd.; Twin City Fire Insurance Company; and Transport Indemnity Company. These insurers, along with Highlands Insurance Company, are also named as Real Parties In Interest in these writ proceedings.
[8] The liability under this policy "shall attach to Underwriters only after the Primary Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability...." (Italics added.)

Under the terms of the policy, "The Words `ultimate net loss' shall be understood to mean the sums paid in settlement of losses for which the Assured is liable after making deductions for all recoveries, salvages and other insurances (other than recoveries under the policy/ies of the Primary Insurers), whether recoverable or not, and shall exclude all expenses and `Costs.' [¶] The word `costs' shall be understood to mean interest on judgments, investigation, adjustment and legal expenses...."
This policy does not expressly promise a defense.
[9] The liability under each of these policies "shall attach only after the Primary and Underlying Excess Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability...." (Italics added.)

Under the terms of these policies, "The Words `ultimate net loss' shall be understood to mean the amount payable in settlement of the liability of the Assured after making deductions for all recoveries and for other valid collectible insurances, excepting however the policy/ies of the Primary and Underlying Excess Insurers, and shall exclude all expenses and Costs. [¶] The word `Costs' shall be understood to mean interest accruing after entry of judgment, investigation, adjustment and legal expenses...."
These policies do not expressly promise a defense.
[10] The liability under this policy "shall attach to the Underwriters only after the Underlying Umbrella Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability...." (Italics added.) The policy does not expressly promise a defense.
[11] As to the balance of the motion, which was not really disputed by Powerine, and is not contested or argued in these proceedings, it was granted.
[12] As indicated on the title page of this opinion, a number of such briefs were gratefully received by this court. The views expressed therein have been fully considered.
[13] For reasons which we explain in the Conclusion portion of this opinion, we are only concerned with the primary policy issued to Powerine by Certain Underwriters.
[14] The Porter-Cologne Water Quality Control Act is not California's only environmental cleanup enforcement statute. (See fn. 2, ante.) The other major state environmental enforcement agency, the Department of Toxic Substances Control ("DTSC"), has similar powers and makes similar use of administrative orders to carry out its mission. Since 1978, DTSC's director has had the statutory ability to determine that a person has caused the disposal of hazardous waste in violation of the Hazardous Waste Control Law and to issue an order specifying a schedule for compliance. (Health & Saf.Code, § 25187.) In addition, the "State Superfund" statute, the Carpenter-Presley-Tanner Hazardous Substance Account Act, begins with the Legislature's expressed intent to "[e]stablish a program to provide for response authority for releases of hazardous substances...." (Health & Saf.Code, § 25301(a); italics added.) Since 1983, this response authority has included providing the director of DTSC with the power to order any responsible party or parties to undertake "appropriate removal or remedial action necessary to protect the public health and safety and the environment" whenever the director determines an imminent or substantial endangerment to the environment exists due to the release or a threatened release of a hazardous substance. (Health & Saf.Code, § 25358.3, subd. (a)(1).) Any person who fails to comply with such an order without sufficient cause is "shall be subject to" a civil penalty of up to $25,000 for each day of noncompliance, and treble damages based on any costs DTSC must incur as a result of the failure to take proper action. (Health & Saf.Code, §§ 25359.2, 25359, respectively.) A party named in a final remedial action plan may seek judicial review of that plan, but the court must uphold the agency's action if it was based on substantial evidence.
[15] On August 20, 1998, the Director of the California Department of Toxic Substances Control (see fn. 14, ante) sent a written request to the Supreme Court requesting a rehearing on or modification of its decision in Foster-Gardner. The comments made in that letter regarding the DTSC's experience in enforcing the Hazardous Substance Account Act have relevance to this same point. The Director stated, in relevant part:

"In the overwhelming majority of instances, with respect to DTSC and the regional water boards, these administrative orders result in substantial compliance, often with the early involvement of the insurance carriers of the liable parties. Therefore, in actual agency practice, these orders are implementing the Legislature's intent for the executive branch of State government to achieve hazardous substance cleanup. Such orders are not merely administrative remedies or hurdles that must be exhausted before meaningful action is carried out pursuant to civil litigation. They are in every practical sense the commencement of an administrative lawsuit where the consequences of noncompliance are far greater than those associated with failing to answer a lawsuit. Even a default judgment following a defendant's failure to answer a civil complaint for damages may be less injurious to defendant's pecuniary interests than an administrative order to which the named party fails to respond. In the latter instance, the respondent named in the order who is named as a defendant in a subsequent formal lawsuit must not only pay damages but is subject to penalties which may potentially exceed damages.... [¶] ... [¶] When DTSC issues an administrative order, all of the elements of liability and the supporting evidence have been identified in the order and in the agency's administrative record, which are readily available to the identified responsible parties and their insurers. As a practical matter, the reason such orders are rarely contested in court on liability grounds is that there is usually nothing as regards status liability that requires litigation  specifically the tools of formal discovery  to resolve.... [¶] In general, this is why persons served with such administrative orders ... rarely forced DTSC to seek a court injunction to enforce the orders. For reasons outlined above, the order itself deterred litigation in most cases by making it superfluous. This central feature of DTSC administrative orders is what distinguishes them from mere claims where liability is neither so clear-cut nor so amenable to proof on the administrative record alone."
[16] As the Foster-Gardner court explained it, "Under the `literal meaning' approach, the term `suit' is deemed unambiguous, referring to actual court proceedings initiated by the filing of a complaint. When no complaint has been filed, there is no `suit' the insurer has a duty to defend. [Citations.]" (Id. at pp. 869-870, 77 Cal.Rptr.2d 107, 959 P.2d 265, fn. omitted; see also fn. 28, post, and cases cited thereat.)
[17] Foster-Gardner summarized the "functional" and "hybrid" approaches that a number of other courts have adopted: "Under the `functional' approach, any receipt of a PRP letter or other precomplaint environmental agency activity constitutes a `suit.' In a refinement of the `functional' approach, other courts have determined that a PRP letter or other precomplaint environmental agency action is a `suit' only if it is sufficiently coercive and threatening. [Citation.] This is the `hybrid' approach. These courts essentially do not consider a mere preliminary notification to be a `suit,' but conclude a proceeding becomes a `suit' if it progresses beyond the mere notification or request for voluntary action stage.... [¶] Under both the functional and hybrid approach, the term `suit' is deemed ambiguous, and interpreted to refer to proceedings other than those in a court of law initiated by the filing of a complaint. Some courts are persuaded that `the fact that another reasonable interpretation of the term "suit" exists simply creates an ambiguity.' [Citation.] Having found ambiguity, courts then determine that an insured would reasonably expect a defense of the administrative agency's order or other activity. [Citation.] [¶] For many courts that conclude an administrative action is a `suit,' `[o]f critical importance is the creation of the administrative record and the role it may play in future litigation. Documentation sought by the EPA, and which [the insured] must produce under the force of law, will determine the amount and type of waste generated by [the insured] and discharged onto the site. Given the strict liability stance of CERCLA, this information is all that is needed to establish both the fact and proportional share of [the insured's] liability at the site. [¶] Moreover, because the EPA may implement any investigatory and remedial action it deems necessary at the site, subject only to an abuse of discretion review, the total cost of the project will also be determined before litigation is brought. The significant authority given to the EPA in such matters allows it essentially to usurp the traditional role of a court of law in determining and apportioning liability. Such matters are concluded by the EPA before the action is ever brought to court.' [Citations.]" (Id. at pp. 871-873, 77 Cal.Rptr.2d 107, 959 P.2d 265; fns. omitted; see also fn. 27, post, and cases cited thereat.)
[18] In Foster-Gardner, as originally filed on August 3, 1998, the following language was included:

"Furthermore, in AIU, we interpreted the phrase `legally obligated' to refer to relief ordered by a court of law. (AIU, supra, 51 Cal.3d at p. 824, 274 Cal.Rptr. 820, 799 P.2d 1253.) We stated that if the insured was not `legally obligated' to pay the relevant costs, the insurers had no duty to provide coverage under the policies. (Id. at p. 818, 274 Cal. Rptr. 820, 799 P.2d 1253 [`Only if all three conditions [were] fulfilled [would] the insurers' duty to provide coverage arise under the policies.']; cf. Montrose Chemical Corp. v. Admiral Ins. Co. (1995) 10 Cal.4th 645, 692, 42 Cal.Rptr.2d 324, 913 P.2d 878 [When an insured receives a PRP letter, `there is uncertainty about the imposition of liability and no "legal obligation to pay" yet established, [thus] there is an insurable risk' for which coverage may be purchased under a third party policy. (Italics omitted.) ].)
"Here, the policies likewise require the insurers to `pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... bodily injury or ... property damage.' Thus, there is also coverage pursuant to this language only for those `damages' ordered by a court of law. The administrative activity for which Foster-Gardner asserts there is a duty to defend has occurred prior to a lawsuit ever being filed." (Italics in original.)
On September 23, 1998, the court issued a modification order which deleted the above quoted material.
[19] There is no contention or argument made in this matter that the contamination of waste sites and surrounding property and migrating groundwater does not constitute property damage. Indeed, this issue was clearly settled by the decision in AIU. (AIU, supra, 51 Cal.3d at pp. 842-843, 274 Cal.Rptr. 820, 799 P.2d 1253.) The reimbursement of the costs incurred to clean up (as well as the costs of injunctive relief to prevent further) contamination of waste sites and the water on an surrounding such sites will constitute "`damages because of property damage.'") (Id. at p. 843, 274 Cal.Rptr. 820, 799 P.2d 1253; italics added.)
[20] In Vandenberg, the lessor had alleged, and an arbitrator had subsequently held, that the lessee's improper installation, maintenance and use of waste oil storage tanks on the leased property had caused the contamination of soils and groundwater and the lessee's acts constituted a breach of the lease agreements. The breach of contract theory was the only one asserted against the insured. A $4 million award by the arbitrator was subsequently confirmed by the judgment of the Superior Court.
[21] The fact that Certain Underwriters' policy provides coverage "irrespective of whether such damages are imposed by law or assumed under contract" does not alter this analysis. Such language simply extends coverage not only to the insured's own conduct, but also to the acts of others for which the insured has contractually agreed to "assume'' liability. (See Old Republic Ins. Co. v. Superior Court (1998) 66 Cal.App.4th 128, 146-147, 77 Cal. Rptr.2d 642, disapproved on other grounds in Vandenberg v. Superior Court, supra,21 Cal.4th at p. 841, fn. 13, 88 Cal.Rptr.2d 366, 982 P.2d 229; Loyola Marymount University v. Hartford Accident & Indemnity Co. (1990) 219 Cal.App.3d 1217, 1225-1226, 271 Cal. Rptr. 528.)
[22] Insurance Code section 22 provides: "Insurance is a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event." (Italics added.)

Insurance Code section 250 provides: "Except as provided in this article, any contingent or unknown event, whether past or future, which may damnify a person having an insurable interest, or create a liability against him, may be insured against, subject to the provisions of this code." (Italics added.)
[23] The Supreme Court reiterated this same point in Aerojet-General Corp. v. Transport Indemnity Co., supra, 17 Cal.4th 38, 70 Cal. Rptr.2d 118, 948 P.2d 909 in its general discussion of the liability undertaken by an insurer under a CGL policy: "In pertinent part, standard comprehensive or commercial general liability insurance policies provide that the insurer has a duty to indemnify the insured for those sums that the insured becomes legally obligated to pay as damages for a covered claim. [Citation.] By definition, this duty entails the payment of money [citation], which is expressly limited in amount [citation], in order to resolve liability [citation]. It is not narrowly confined to money that the insured must give under law as compensation to third parties, but may also include money that the insured must itself expend in equity in order to provide relief of the same sort. [Citation.] It runs to claims that are actually covered, in light of the facts proved. [Citation.] It arises only after liability is established and as a result thereof. [Citation.]" (Id. at p. 56, 70 Cal.Rptr.2d 118, 948 P.2d 909; italics added.)
[24] In rejecting an insurer's assumption that site investigation expenses ordered or requested by a state or federal administrative agency could not be considered defense costs because they were necessarily indemnification expenses within the meaning of the AIU decision (i.e., sums which [an insured] became `legally obligated' to pay as `damages' ... because of property damage'' [AIU, supra, 51 Cal.3d at p. 824, 274 Cal.Rptr. 820, 799 P.2d 1253]), the Aerojet court stated, "There is a suggestion that a `legal obligation' arises from a governmental order and perhaps even from a governmental request. But any such `legal obligation' need not be `to pay ... "damages" ... because of "[bodily injury or] property damage." ` For example ... as indicated in the text, a legal `obligation' may be imposed under CERCLA even before specified harm is proved  and even if such harm is subsequently disproved." (Aerojet-General Corp. v. Transport Indemnity Co., supra, 17 Cal.4th at p. 67, fn. 15, 70 Cal.Rptr.2d 118, 948 P.2d 909; italics in original.)
[25] Our dissenting colleague argues that this phrase is nonetheless ambiguous and that a "reasonable layperson" would not expect it to have reference only to "legal obligations" fixed by a court of law. In support of that conclusion the dissent points to the language of the excess policy which was contemporaneously issued by Certain Underwriters to Powerine. In that policy, Certain Underwriters promised to pay all sums "which the insured shall by law become liable to pay and shall pay or by final judgment be adjudged to pay ... as damages." Such excess policy language, however, could not create an objectively reasonable expectation that coverage under the primary policy would be triggered by a "coercive administrative order." There are two reasons why this is so.

First, it is fundamental to coverage under the excess policy that there be an exhaustion of coverage under the primary policy; that is, excess liability will attach only after the "primary insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability" (see fn. 8, ante ). Excess coverage also requires that the underlying liability of the insured must be established and either (1) in fact paid or (2) demonstrated by a final judgment (e.g., if no judgment has been entered, then coverage will exist upon the actual payment of an agreed settlement). In other words, these provisions in the excess policy serve a different purpose than the insuring clause in the primary policy; the excess policy language describes the requirements for primary exhaustion as the essential predicate to excess coverage. Thus, the language in the excess policy cannot serve as a basis for creating a reasonable expectation of coverage under the primary. The primary policy has no need to provide for a nonjudgment alternative in the description of its indemnification duty as it would necessarily participate in a settlement or prejudgment payment of the underlying third-party claim.
Second, the dissent provides no explanation as to how the language of these two policies, even if properly read together, could create an objectively reasonable expectation of coverage for an order resulting from an administrative process which the Supreme Court has characterized as amounting to a "claim" rather than a "suit." (Foster-Gardner, supra, 18 Cal.4th at pp. 878-879, 881-883, 77 Cal. Rptr.2d 107, 959 P.2d 265.) Certainly, no insured could harbor the objectively reasonable expectation that a third party's assertion of a "claim" meant that the insured was "legally obligated to pay [such claim] as damages."
[26] In Aerojet-General Corp. v. Transport Indemnity Co., supra, 17 Cal.4th at pp. 66-67, 70 Cal.Rptr.2d 118, 948 P.2d 909, the Supreme Court (quoting from Firefighters v. Cleveland (1986) 478 U.S. 501, 519, 521-522, 106 S.Ct. 3063, 3073, 92 L.Ed.2d 405) characterized the consent decree process as follows: "`To be sure, consent decrees bear some of the earmarks of judgments entered after litigation. At the same time, because their terms are arrived at through mutual agreement of the parties, consent decrees also closely resemble contracts.'.... Their `most fundamental characteristic,' however, is their `voluntary nature.'.... `Indeed, it is the parties' agreement that serves as the source of the court's authority to enter any judgment at all.'.... `More importantly, it is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in a consent decree.' [Citation.]"

We do not address the question of the legal impact of the use of a consent decree here, because there was no such decree involved in this matter. However, we note that the utilization of such a procedure may raise problems relating to insurer liability arising from such policy conditions as those requiring prompt and adequate notice of claims and imposing restrictions on an insured's "voluntary" payments or settlements.
[27] The cases cited in support of Powerine's argument include decisions where the court found that even the "voluntary" cleanup efforts made in response to letters or orders from environmental agencies were covered. For policy reasons, these courts concluded that in view of the statutory liability with which the insured was threatened, and the necessarily limited time for response, a reasonable insured would conclude that the administrative proceedings initiated by the governmental agencies was a "suit" and that such proceedings would result in a "legal obligation" within the meaning of the insured's CGL policy. However, in none of these cases was there any holding that environmental administrative proceedings could not, as a matter of law, constitute a "suit" as was the holding in Foster-Gardner. Indeed, in four of these cases the court adopted the broad functional analysis of a "suit" which was specifically rejected by Foster-Gardner. (See Aetna Cas. & Sur. Co., Inc. v. Pintlar Corp. (9th Cir.1991) 948 F.2d 1507, 1517-1518 [applying Idaho law, held that a PRP letter triggers duty to defend as CERCLA liability is far reaching and ordinary person would believe PRP notice is commencement of "suit"; coverage under CGL policy should not depend on EPA decision to proceed administratively rather than go directly to litigation]; A.Y. McDonald Industries v. INA (Iowa 1991) 475 N.W.2d 607, 621-622, 628-629 [term "suit" is ambiguous and broad interpretation should be adopted; PRP notice has serious consequences, is substantially equivalent to a law suit and therefore duty to defend arises immediately; administratively mandated response costs are "damages because of property damage"]; Mich. Millers Mut. Ins. v. Bronson Plat. (1994) 445 Mich. 558, 570-575, 519 N.W.2d 864, 870-872 [PRP letter constitutes functional equivalent of the initiation of a lawsuit as it begins a process which creates an administrative record and usurps traditional role of court by both determining and apportioning liability]; Coakley v. Maine Bonding and Cas. Co. (1992) 136 N.H. 402, 415-418, 618 A.2d 777, 785-787 [PRP notice commences a legal process which will conclusively and legally determine insured's liability subject only to review for abuse of discretion; the administratively-mandated response costs constitute "damages" within the meaning of CGL policy].)

In six other cases, the issue of whether a defense was owed was not even raised. (See Public Serv. Co. v. Wallis & Companies (Colo. App.1997) 955 P.2d 564, 567-568, cert, granted, No. 97SC792 (Colo. May 26, 1998) [policy language does not require environmental enforcement action before coverage is triggered; insured's "voluntary" cleanup efforts do not preclude coverage given mandatory provisions of CERCLA; prompt cleanup and voluntary settlement purposes of environmental laws would be frustrated if coverage were denied]; Compass Ins. Co. v. Cravens, Dargan & Co. (Wyo.1988) 748 P.2d 724, 728-729 [prompt voluntary cleanup cannot defeat coverage]; Maryland Cas. Co. v. Wausau Chemical Corp. (W.D.Wis.1992) 809 F.Supp. 680, 690-692, 695-696 [voluntary cleanup activities in advance of litigation are covered "damages"; CERCLA response costs incurred pursuant to consent decree following negotiations with EPA were not excludable "voluntary" payments in view of stiff penalties for insured's failure to negotiate]; Weyerhaeuser Company v. Aetna Casualty & Sur. Co. (1994) 123 Wash.2d 891, 905-913, 874 P.2d 142, 149-154 [prompt remedial action by insured should be encouraged, not discouraged; given statutory duty to clean up contaminated sites, the costs thereof fall within insured's legal "obligation to pay as damages"; coverage should not be denied because administrative agency has not been sufficiently hostile]; CD. Spangler Const. Co. v. Indus. Crankshaft & Eng. Co., Inc. (1990) 326 N.C. 133, 152-155, 388 S.E.2d 557, 569-570 [cleanup costs are "damages" within meaning of CGL policy; in absence of specific policy language defining the term "damages," it should be given its ordinary meaning; administrative compliance orders constitute a "suit"]; Bausch & Lomb v. Utica Mutual (1993) 330 Md. 758, 779-783, 625 A.2d 1021, 1031-1033 [response costs constituted "damages" and, when paid as a result of administrative proceedings conducted pursuant to environmental laws imposing liability, they are a sum which the insured is "legally obligated to pay"; thus they constitute "damages" within meaning of CGL policy].)
Other jurisdictions also follow these same principles (see, e.g., SCSC Corp. v. Allied Mut. Ins. Co. (Minn. 1995) 536 N.W.2d 305, 315-316 [a request for information by administrative environmental agency regarding insured chemical distributor's responsibility for groundwater contamination constituted a "suit"]; Minnesota Mining & Mfg. Co. v. Travelers Indem. Co. (Minn. 1990) 457 N.W.2d 175, 179-183 [expenditures mandated by state environmental agency pursuant to state law which were necessary to effect cleanup of contaminated sites are "damages because of ... property damage"; insurer's promise to pay all sums for which insured becomes "legally obligated to pay as damages because of property damage" is ambiguous and is construed against insurer]; Alabama Plating v. U.S. Fidelity and Guar. Co. (Ala. 1996) 690 So.2d 331, 336-337 [environmental remediation costs imposed by cleanup orders issued by state environmental agency constitute "damages" covered under standard CGL policy]; Hazen Paper Co. v. U.S. Fidelity and Guar. Co. (1990) 407 Mass. 689, 698-701, 555 N.E.2d 576, 582-584 [where letter from administrative agency contains allegations of environmental damage being caused by release of toxic substances and includes possibility of groundwater contamination it is sufficient to state a claim for "damages on account of property damage," thus triggering insurer's duty to defend; insured would have objectively reasonable expectation of coverage in such circumstances]; Anderson Development Co. v. Travelers Indemnity Co. (6th Cir.1995) 49 F.3d 1128, 1131-1133 [applying Michigan law, held that PRP letter was initiation of "suit" triggering duty to defend and environmental cleanup and response costs were "damages" covered by CGL policy]; Avondale Indus., Inc. v. Travelers Indem. Co. (2d Cir.1989) 887 F.2d 1200, 1206-1207 [applying New York law and concluding that an adversarial administrative proceeding which threatened the insured with substantial consequences for a failure to comply with state's demands was a "suit"].)
[28] The only other jurisdictions of which we are aware in which the highest appellate court has adopted the same rule as Foster-Gardner are the states of Illinois, Wisconsin and Maine. (See Lapham-Hickey Steel v. Protection Mut. Ins. (1995) 166 Ill.2d 520. 530-532, 211 Ill.Dec. 459, 655 N.E.2d 842, 846-848 [there is no "suit" where EPA issues PRP letter (and submits draft consent decree) asserting that insured has potential environmental contamination liability, but does not bring court proceedings; in absence of a "suit," insured is not entitled to recover costs of investigating claimed contamination]; Zurich Ins. Co. v. Cams Corp. (1997) 293 Ill. App.3d 906, 908-910, 228 Ill.Dec. 258, 689 N.E.2d 130, 132-134 [liability insurer's duty to defend and indemnify is triggered only by "suit" against the insured and, in absence of a lawsuit, no such duty exists; insured's expenses voluntarily incurred conducting investigation of claimed contamination site through the administrative environmental agency did not suffer damages which it was "legally obligated to pay" and therefore such costs may not be recovered from liability insurer]; Fruit of the Loom, Inc. v. Travelers Indem. Co. (1996) 284 Ill.App.3d 485, 494-495, 219 Ill.Dec. 770, 672 N.E.2d 278, 285-286 [letter from state environmental agency encouraging insured to undertake remedial action to clean up PCB pollution was not a "suit" and did not trigger coverage under CGL policy]; City of Edgerton v. General Cos. Co. (1994) 184 Wis.2d 750, 779-786, 517 N.W.2d 463, 476-479, cert, denied, Edgerton Sand & Gravel, Inc. v. General Cos. Co. of Wisconsin (1995) 515 U.S. 1161, 115 S.Ct. 2615, 132 L.Ed.2d 858 [confrontational correspondence from state and federal environmental agencies to insured regarding cleanup of contaminated sites were not the "functional equivalent of a suit" so as to trigger coverage under CGL policy]; Patrons Oxford Mut. Ins. Co. v. Marois (Me. 1990) 573 A.2d 16, 19-20 [state environmental agency's administrative proceedings to compel cleanup of pollution from underground gasoline tanks was not "suit against the insured seeking damages" under CGL policy; nor were insured's expenses to meet agency cleanup demands with respect to such pollution "damages" within the meaning of the policy]; see also Aetna Cos. & Sur. Co. v. General Dynamics Corp. (8th Cir.1992) 968 F.2d 707, 713-714 [applying Missouri law and holding that EPA demand letters are not "suits" for damages].)
[29] Powerine and amici argue that the duty to indemnify is really "independent" of the duty to defend and thus we should evaluate that policy commitment separately. However, the language in "certain decisions stating or implying that the duty to defend is `independent' of the duty to indemnify [citations] means nothing more than that the former is broader than the latter. Both the duty to indemnify and the duty to defend are in fact dependent on coverage  the former on actual coverage, the latter on at least potential coverage." (Buss v. Superior Court (1997) 16 Cal.4th 35, 47, fn. 10, 65 Cal.Rptr.2d 366, 939 P.2d 766.)
[30] Our conclusion in this matter, however, should not be construed as adversely impacting an insurer's exercise of its policy right to investigate, defend or settle any claim asserted against an insured prior to the filing of a "suit."
[31] See footnotes 8, 9, and 10, ante.
[32] No party or amici contends otherwise and copies of such other policies are not included in this record.
[1] While this may lead to the seemingly anomalous result of finding that the insurer has a duty to indemnify where it may have no duty to defend, there is nothing to prevent the parties from contracting for this result.
[2] Indeed, the language in Foster-Gardner referring to the phrase "`legally obligated to pay as damages because of ... bodily injury or ... property damage'" was deleted pursuant to a modification order filed on September 23, 1998, (19 Cal.4th 253e, 77 Cal.Rptr.2d 107, 959 P.2d 265; see maj. opn. at p. 719, fn. 18), leaving us without direction on this issue from the Foster-Gardner decision.
[3] In a footnote, the majority attempts to explain the reason for this difference in language between the primary and excess policies. (Maj. opn. at pp. 726-727, fn. 25.) In my view the very fact that the majority feels compelled to justify the difference only serves to underscore the fact that this insurer knew exactly what the difference in language meant and the ramifications of not employing the limiting words "by final judgment" in the primary policy's indemnity-triggering phrase.
[4] In AIU, the Supreme Court addressed the question of whether the phrase "legally obligated to pay as damages" in the CGL policy covers the court-ordered costs to reimburse government environmental agencies, as well as expenditures to comply with court-ordered clean-up injunctions. The AIU Court concluded that the phrase "present[s] some ambiguity in light of statutory schemes that by their very operation tend to eliminate the formal distinction between compensation paid to an aggrieved party and sums expended by the insured under compulsion of injunction." (AIU, supra, 51 Cal.3d at p. 828, 274 Cal.Rptr. 820, 799 P.2d 1253.) The Court in AIU held that the operative language covers the costs of reimbursing government agencies and complying with environmental injunctions requiring remediation and mitigation. (Id., at pp. 814, 841, 274 Cal.Rptr. 820, 799 P.2d 1253.) Unlike here, in AIU, the damages were fixed by a court after a lawsuit had been filed against the PRP. In Vandenberg, the Supreme Court concluded that the phrase at issue here could be applied equally to damages awarded on a contractual theory as to those awarded on a tort theory. (Vandenberg, supra, 21 Cal.4th at p. 841, 88 Cal.Rptr.2d 366, 982 P.2d 229.) In reaching their conclusions, both the AIU and the Vandenberg Courts applied the well-settled rules of policy interpretation. (Id., at pp. 839-841, 88 Cal. Rptr.2d 366, 982 P.2d 229; AIU, supra, at pp. 821-824, 274 Cal.Rptr. 820, 799 P.2d 1253.)
[5] Black's Law Dictionary defines "damages" as "[a] pecuniary compensation or indemnity, which may be recovered in the courts by any person who has suffered loss, detriment, or injury, whether to his person, property, or rights, through the unlawful act or omission or negligence of another." (Black's Law Dictionary (6th ed.1990) p. 389, italics added.)
[6] Civil Code section 3281 provides: "Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages."

Webster's Third International Dictionary defines damages as: "the estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right." (Webster's Third New Internat. Diet., Unabridged (16th ed.1971), p. 571; see also AIU, supra, 51 Cal.3d at pp. 825-826, 274 Cal.Rptr. 820, 799 P.2d 1253.)
[7] In Vandenberg, the insurers contended that the phrase "legally obligated to pay as damages" referred to liability in tort and not in contract. (Vandenberg, supra,21 Cal.4th at p. 838, 88 Cal.Rptr.2d 366, 982 P.2d 229.) Vandenberg disagreed, stating, "... we reject the ex contractu/ex delicto distinction, which derives from a misreading of the seminal case, Ritchie v. Anchor Casualty Co. [supra]." (Id. at p. 839, 88 Cal.Rptr.2d 366, 982 P.2d 229.) After explaining the genesis of the error, Vandenberg went on to disapprove the subsequent authority which failed to consider "the particular and explicit coverage language before the Ritchie court, and thus create[d] an arbitrary distinction that ignores otherwise settled principles of insurance contract interpretation." (Ibid.)